ATTORNEYS FOR APPELLANT
Michael K. Sutherlin
Samuel M. Adams
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

Stephen R. Creason
Chief Counsel

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

ATTORNEY FOR AMICUS CURIAE
ACLU OF INDIANA
Gavin M. Rose
Indianapolis, Indiana

ATTORNEYS FOR AMICI CURIAE
EAGLE FORUM, ET AL.
Eugene Volokh
Los Angeles, California

James Bopp, Jr.
Justin L. McAdam
Terre Haute, Indiana



# In the
# Indiana Supreme Court

No. 15S01-1405-CR-309

DANIEL BREWINGTON,

*Appellant (Defendant),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff).*

Appeal from the Dearborn Superior Court II, No. 15D02-1103-FD-84
The Honorable Brian Hill, Special Judge

On Petition to Transfer from the Indiana Court of Appeals, No. 15A01-1110-CR-550

**May 1, 2014**

**Rush, Justice.**

The United States and Indiana constitutions afford sweeping protections to speech about public officials or issues of public or general concern, even if the speech is intemperate or caustic. But there is no such protection for "true threats"—including veiled or implied threats, when the totality of the circumstances shows that they were intended to put the victims in fear for their safety.

Fear for one's *reputation* is often the price of being a public figure, or of involvement in public issues. But fear for one's *safety* is not.

Here, the Court of Appeals failed to distinguish between those two types of fear. Many of Defendant's statements, at least when viewed in isolation, threatened only to harm the victims' reputations—hyperbolically accusing them of "child abuse" and the like. To the extent those statements were aimed at a public official or involved an issue of public concern, they are subject to the steep constitutional "actual malice" standard for defamatory speech, and the Court of Appeals erred in relying on them to support Defendant's convictions for intimidating a judge and attempted obstruction of justice.

But Defendant's other statements and conduct, understood in their full context, clearly were meant to imply credible threats to the victims' *safety*. The "true threat" inquiry requires reference to all the contextual factors—one of which is the anger and obsessiveness demonstrated even by the protected portions of Defendant's speech. And Defendant had also demonstrated mental disturbance, volatility, violence, and genuine dangerousness directly to both of his victims during his years-long vendetta against them. In that context, Defendant's conduct, including showing his victims against a backdrop of obsessive and volatile behavior that he knew where they lived, was clearly intended to place them in fear—not fear of merely being ridiculed, but fear for their homes and safety, the essence of an unprotected "true threat." Causing that fear is unlawful in itself, and all the more damaging when, as here, it aims to interfere with these victims' lawful obligations of being a neutral judicial officer or a truthful witness—both of which are at the core of our justice system.

And the failure of the jury instructions and general verdict to distinguish between protected speech and unprotected true threats did not prejudice Defendant's substantial rights here. To the contrary, we conclude that he deliberately invited that error, because requesting only broad-brush free-speech instructions enabled a broad-brush defense—emphasizing the protected, "political protest" aspects of his speech that threatened only the victims' *reputations*, while glossing over his statements and conduct that gave rise to more sinister implications for their *safety*. That approach was constitutionally imprecise, but pragmatically solid—and nothing suggests that counsel blundered into it by ignorance, rather than consciously choosing it as well-informed strategy. It was an invited error, not fundamental error or ineffective assistance of trial counsel.

We therefore grant transfer and affirm Defendant's convictions for intimidation of a judge and attempted obstruction of justice. On all other counts, we summarily affirm the Court of Appeals.

2

## Procedural History

In February 2011, a grand jury indicted Defendant Daniel Brewington on six charges. Four related to the Defendant's divorce case that had been finalized in mid-2009[1]: a D-felony count of intimidating the trial judge, two A-misdemeanor counts of intimidation involving the judge's wife and a psychologist who was an expert witness in the divorce, and one D-felony count of attempted obstruction of justice relating to the psychologist. He was also indicted on a D-felony count of perjury relating to his grand-jury testimony, and a B-misdemeanor count of unlawful disclosure of grand jury proceedings. A jury acquitted Defendant of the unlawful disclosure charge but convicted on all other counts, and he appealed.

The Court of Appeals reversed both of the misdemeanor-level intimidation convictions. Brewington v. State, 981 N.E.2d 585, 596, 599 (Ind. Ct. App. 2013) (vacated by this opinion, see Ind. Appellate Rule 58(A)). As to the psychologist, the Court found a "reasonable possibility" that the jury used the same evidence to establish all the essential elements of both intimidation and attempted obstruction of justice, and therefore reversed the intimidation charge on double-jeopardy grounds. Id. at 595–96. It also found insufficient evidence of a threat to the judge's wife, since Defendant had not targeted her by a long-running or negative course of conduct as he had with the other two victims. See id. at 599. But it affirmed all three D-felony convictions. Id. at 610.

Defendant sought transfer, and we held oral argument on September 12, 2013 prior to deciding whether to accept transfer. We now grant transfer, concluding that the Court of Appeals erred in its free-speech analysis by failing to distinguish between Defendant's attacks on his victims' *reputations* that are protected by the stringent actual malice standard, and his true threats to their *safety* that receive no such protection. But we find ample evidence of true threats to support Defendant's convictions for intimidating the judge and his attempted obstruction of justice regarding the psychologist—and find that the general-verdict and instructional errors he complains of were invited error, not fundamental error or ineffective assistance of counsel. On all other counts, we summarily affirm the Court of Appeals. App. R. 58(A)(2).

---

[1] All aspects of Defendant's divorce decree were affirmed by *per curiam* decision of the Court of Appeals, and this Court declined review. Brewington v. Brewington, No. 69A05-0909-CV-542 (Ind. Ct. App. July 20, 2010), trans. denied.

**Standard of Review**

Defendant's free-speech challenge to his convictions, at bottom, questions the sufficiency of the evidence. Ordinarily, we would review such an issue with great deference to the jury's verdict—considering only the evidence favorable to the conviction, and affirming unless no reasonable fact-finder could find the necessary elements to have been proven beyond reasonable doubt. E.g., Drane v. State, 867 N.E.2d 144, 146 (Ind. 2007).

But here, as further discussed below, constitutional protection for Defendant's speech hinges on state-of-mind issues—particularly, whether he intended his communications as threats and whether his victims were reasonable in perceiving them as threats. Deferential review of such questions creates an unacceptable risk of under-protecting speech. It is our constitutional duty, then, to "make an independent examination of the whole record, so as to assure ourselves that the [conviction] does not constitute a forbidden intrusion on the field of free expression." Journal-Gazette Co. v. Bandido's, Inc., 712 N.E.2d 446, 455 (Ind. 1999) (quoting New York Times Co. v. Sullivan, 376 U.S. 254, 285 (1964)) (internal quotation marks omitted). This "rule of independent review assigns to judges a constitutional responsibility that cannot be delegated to the trier of fact," no matter whether the finder of fact was a judge or a jury. Bandido's, 712 N.E.2d at 455 (quoting Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 501 (1984)) (internal quotation marks omitted).

Here, we have independently reviewed the record *de novo*, and are convinced beyond reasonable doubt that Defendant fully intended to make "true threats" against his victims, and that his victims were reasonable to perceive them as threats in view of the context in which he made them. But because many of Defendant's statements, in isolation, were protected—and even his true threats were carefully veiled—we will discuss "all of the contextual factors" of his statements in considerable detail, see Virginia v. Black, 538 U.S. 343, 367 (2003), to identify how they took on their threatening implications.

**Background Facts**

Defendant was a disgruntled divorce litigant dissatisfied with a child-custody evaluator's recommendation. He waged an obsessive years-long campaign—including faxes (often several per day), repetitive *pro se* motions, and Internet posts—accusing the parties' child-custody evaluator, Dr. Edward Connor ("the Doctor"), and Judge James Humphrey ("the Judge"), of "unethical" and

4

"criminal" conduct. The campaign began in 2007 when the Doctor concluded in his report that joint custody of the parties' children would be unworkable, and that Defendant's "degree of psychological disturbance . . . is concerning and does not lend itself well to proper parenting." Ex. 9 at 28–29. Defendant believed he was entitled to a full copy of the Doctor's file to challenge his findings, e.g., Ex. 26, but the Doctor refused to provide it without a court order or the former wife's consent because the file would reveal her confidential mental health information, e.g., Ex. 123 at 7, 12 ("We cannot release a copy of the case file to you without Ms. Brewington's consent, as it contains confidential information about her as well as the children in addition to yourself"; "Without Ms. Brewington's consent or a Court order from Judge Taul, I am prohibited from releasing the confidential information contained within the file per state and HIPAA laws and regulations."). Defendant and the Doctor soon came to an impasse.

At that point, Defendant began to bombard the Doctor's office with letters and faxes, sometimes multiple times per day, making threats of civil and criminal lawsuits and professional discipline, accompanied by repeated and pointed demands to withdraw as a witness in the case. E.g., Exs. 38–39, 41, 43–44. Moreover, he accused the Doctor and Carl Taul, the original trial judge, of improper *ex parte* communications with each other, until Judge Taul eventually recused and appointed Judge Humphrey as special judge. See Ex. 120 (Order Naming Special Judge). Defendant considered his campaign a success as to Judge Taul, referring to the recusal frequently in subsequent blog posts. Exs. 160, 162, 167, 171, 191, 194. But even though those actions had led the Doctor to the professional opinion that Defendant was "potentially dangerous," Tr. 131–32; Ex. 132 at 7, he remained in the case. The Doctor ultimately opined that Defendant is paranoid, manipulative, "manic-like," "unwilling to accept responsibility for his behavior," self-centered, unreceptive to criticism, and "has difficulty seeing an issue from another's perspective"—again, "a degree of psychological disturbance that . . . does not lend itself to proper parenting." Ex. 140 (Judgment and Final Order on Decree of Dissolution of Marriage ("Decree"), Finding 8(K)).

At the final hearing, Defendant's in-court behavior—including slamming piles of books, outbursts of angry yelling, and inappropriate laughing—confirmed those impressions. See Ex. 140 (Decree, Finding 8(K)). His behavior was so volatile that the court had a sheriff's deputy in the courtroom whenever he was present. Tr. 237–38. Evidence at the hearing established that Defendant had also "made a less than subtle attempt to intimidate" his wife's counsel, who co-owned a firearms training business with her husband, by calling their home to seek weapons training from the

5

business while the divorce was pending, Ex. 140 (Decree, Finding 8(S))—even though the business was not actively advertised, and was located well over an hour's drive from Defendant's home, Tr. 69–70. Moreover, Defendant bought a .357 Magnum handgun shortly after his former wife filed for divorce, but never returned it to her as the Decree required, Tr. 62, 325; Ex. 140 (Decree) at Conclusion 16 & Ex. D at 3—purportedly for concern about *her* mental stability, Ex. 148 at 8 (¶ 26). And Defendant posted online that the divorce case was "like playing with gas and fire, and anyone who has seen me with gas and fire know[s] that I am quite the accomplished pyromaniac," and that authorities "would have to kill [me] to stop [me]" from posting confidential divorce details online. Ex. 140 (Decree, Findings 8(N)–(O)).

Relying on the Doctor's testimony about Defendant's mental health and dangerousness, evidence of Defendant's attempts at intimidating witnesses and opposing counsel, and the court's own observation of Defendant's behavior, the court awarded child custody to his former wife. Id. (Decree, Finding 8(S) & Conclusion 3). It further ordered Defendant's parenting time suspended pending a mental-health evaluation "to determine if he is possibly a danger to the children, Wife, and/or to himself," followed by a schedule of supervised parenting time transitioning to unsupervised. Id. (Conclusion 4).

Defendant considered that ruling tantamount to termination of his parental rights. See, e.g., Ex. 142 at 2 (¶ 7) (characterizing decree as "terminating [Defendant's] parental rights"). But instead of taking the court-ordered steps to maintain his relationship with his children, he escalated his efforts at intimidating the Judge and the Doctor—efforts he was able to pursue full-time, since he was unemployed at all times during and after the divorce, supported by his mother's provision of a rent-free house and $2,500 monthly assistance. See Ex. 140 (Decree, Finding 9(A)). First, Defendant used the Internet (and at least implied that he would use mass mailings) to publicize the Judge's home address, Exs. 142 (attachment to Motion for Relief from Judgment), 160—leading the Judge to install a home-security system, keep a firearm ready at home for the family's protection, notify his children's schools about Defendant's threats, and arrange police escorts for his wife's commute to work, Tr. 252, 255. Then, Defendant used an ongoing series of Web posts to demonstrate his ability to find and publicize personal information about the Doctor—including his home address, Ex. 199 (causing him to fear for his children's safety, Tr. 166–67); a private family photo of him dancing at a family member's wedding, Tr. 201, Ex. 201; and details about his brother and late father, Tr. 96–97, Exs. 33, 193. He wrote in one post that the Doctor "may be a [p]ervert," Ex. 181; and in another

about a supposedly hypothetical "Dr. Custody Evaluator" who "made me so mad I wanted to beat him/her senseless" and "punch Dr. Custody Evaluator in the face," Ex. 177. Then after that, Defendant showed up at an unrelated hearing where the Doctor was testifying, bragging afterward that his presence made the Doctor "a little nervous and from a psychological standpoint he probably should have been." Ex. 200. Indeed, Defendant's actions prompted the Doctor and his wife to show his picture to their children and co-workers and notify area law enforcement requesting additional protection, while keeping his threats secret from elderly family to avoid worrying them. Tr. 159–66, 203–04.

Any one of those statements in isolation might be no more than ambiguously threatening. But reading them as a whole within the totality of the circumstances shows that at least by the time he published the victims' addresses, (1) Defendant intended his long-running pattern of communications and conduct to be a credible implied threat to his victims' safety in retaliation for their lawful roles in his divorce case, and (2) his victims quite reasonably took his threats seriously. That is the essence of a constitutionally unprotected threat—one that Defendant strongly implied by the escalating tone and frequency and long-running duration of his diatribes (even the ones that in themselves were protected speech); his express recognition that his actions would be perceived as threatening; the victims' knowledge of his psychological disturbance and dangerousness; and their firsthand observation of his obsessive, volatile, and violent behavior. Within that context, Defendant telling his victims that he knew where they lived was clearly intended to make them justifiably feel unsafe even in their own homes. And the jury's perjury verdict implicitly recognized that intent, finding that Defendant lied to the grand jury about his true motives for posting the Judge's address. We will discuss the context of Defendant's statements in greater detail in connection with each victim.

### Discussion and Decision

### I. Intimidation and Free-Speech Limitations on "Threats" to Commit Defamation

The grand jury indicted Defendant for intimidating the Judge under Indiana Code section 35-45-2-1(a)(2) (2008), for "communicat[ing] a *threat* to" the Judge, with the intent to "place[ him] in fear of retaliation for [the] prior lawful act" of issuing the divorce decree.[2] App. 22 (emphasis added). Defendant's indictment for attempted obstruction of justice is also rooted in intimidation—

---

[2] The basic intimidation offense is a misdemeanor, but becomes a Class D felony if the threat is made against "a judge or bailiff of any court." I.C. § 35-45-2-1(b)(1)(B)(ii).

specifically, alleging that he tried to "*intimidate* and/or harrass [*sic*]" the Doctor to prevent him from testifying in the divorce case.[3] App. 24 (emphasis added). Both charges therefore depend on a "threat" as defined by statute:

> "Threat" means an expression, by words or action, of an intention to:
>
> (1) unlawfully injure the person threatened or another person, or damage property;
>
> (2) unlawfully subject a person to physical confinement or restraint;
>
> (3) commit a crime;
>
> (4) unlawfully withhold official action, or cause such withholding;
>
> (5) unlawfully withhold testimony or information with respect to another person's legal claim or defense, except for a reasonable claim for witness fees or expenses;
>
> (6) expose the person threatened to hatred, contempt, disgrace, or ridicule;
>
> (7) falsely harm the credit or business reputation of the person threatened; or
>
> (8) cause the evacuation of a dwelling, a building, another structure, or a vehicle.

I.C. § 35-45-2-1(c).

But our inquiry cannot end with the statutory definition. As *amici* point out,[4] subpart (c)(6) parallels the classic common-law definition of defamation, and (c)(7) reflects a particular type of defamation. E.g., Armentrout v. Moranda, 8 Blackf. 426, 427 (Ind. 1847) ("A libel is said to be a malicious defamation expressed in printing or writing . . . , tending to injure the reputation of another, and thereby exposing such person to public hatred, contempt, or ridicule."); Johnson v. Stebbins, 5 Ind. 364, 366–67 (1854) ("Any publication that tends to degrade, disgrace, or injure the character of a person, or bring him into contempt, hatred, or ridicule, is as much a libel as though it contained charges of infamy or crime.") Subparts (c)(6) and (7), then, essentially criminalize defamation by including it in the definition of a punishable "threat." The same constitutional free-speech protections that apply in civil defamation cases therefore must also apply to prosecutions under (c)(6) and (7).

---

[3] Despite summarily affirming reversal of the conviction for intimidating the Doctor, intimidation remains central to our analysis because it was the *means* by which Defendant attempted to obstruct justice—hence the Court of Appeals' double-jeopardy reversal of that conviction.

[4] We thank all *amici* for their helpful briefs.

The First Amendment aims to "ensure that debate on public issues remains 'uninhibited, robust, and wide-open.'" Milkovich v. Lorain Journal Co., 497 U.S. 1, 20 (1990) (quoting New York Times, 376 U.S. at 270). "The sort of robust political debate encouraged by the First Amendment is bound to produce speech that is critical of those who hold public office"—but "'[o]ne of the prerogatives of American citizenship is the right to criticize public men and measures.'" Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 51 (1988) (quoting Curtis Publ'g Co. v. Butts, 388 U.S. 130, 164 (1967) (Warren, C.J., concurring in result) and Baumgartner v. United States, 322 U.S. 665, 673–74 (1944)). "Such criticism, inevitably, will not always be reasoned or moderate; public figures as well as public officials will be subject to 'vehement, caustic, and sometimes unpleasantly sharp attacks.'" Falwell, 485 U.S. at 51 (quoting New York Times, 376 U.S. at 270). Even when those attacks are unfair, offensive, or ignorant, the First Amendment protects them so that legitimate debate will not be stifled.

Foremost among those protections is the "actual malice" standard (sometimes called "constitutional malice" to distinguish it from mere spitefulness) for speech about public officials. Fifty years ago, New York Times v. Sullivan held that a State may not punish "a defamatory falsehood relating to [a public official's] official conduct unless [the State] proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. at 279–80 (so holding in civil defamation claim). "[S]uch a privilege is required by the First and Fourteenth Amendments." Id. at 283. In turn, "reckless disregard" is not "measured by whether a reasonably prudent man would have published, or would have investigated before publishing," St. Amant v. Thompson, 390 U.S. 727, 731 (1968); but rather requires "that the defendant in fact entertained serious doubts as to the truth of his publication," id., or had a "high degree of awareness of their probable falsity," Garrison v. Louisiana, 379 U.S. 64, 74 (1964)—even if the statements are made with ill will, id. at 78–79. Since a trial judge is clearly a public official, Defendant's statements about the Judge are subject to this very high standard as a matter of federal constitutional law.

## A. The Judge

In his blog posts, Defendant's criticisms of the Judge were rather generalized—contending that the Judge "has abused my children" or otherwise done "mean things to my children and my family," Ex. 160; was guilty of "criminal conduct," Ex. 181; or was simply "crooked," Ex. 186, or

"a nasty evil man," Ex. 183. But he also posted a copy of his August 24, 2009 "Motion to Grant Relief from Judgment and Order" online, see Ex. 142 at 9, in which he alleged that the Judge:

- "has a substantial conflict of interest as[ he] was aware that Dr. Connor was not licensed to practice psychology by the State of Indiana when [he] had appointed Dr. Connor to perform psychological services for an Indiana Court," Ex. 142 at 2 (¶ 6);

- "conducted himself in a willful, malicious, and premeditated manner in punishing the Respondent for attempting to protect the parties' minor children, the Counties of Ripley and Dearborn, and the States of Indiana and Kentucky from the actions of Dr. Edward J. Connor by terminating the Respondent's parental rights," id. (¶ 7);

- "robbed [Defendant's] parenting rights as revenge for fighting injustice," id. at 9;

- "caused irreparable damage to the Respondent's children in the Court mandated child abuse [*sic*]" by "illegally eliminating their father from their lives out of the Court's self-interest," id. at 9–10; and

- used "child abducting tactics" by issuing the divorce decree, id. at 10.

In the motion, Defendant also threatened to "fil[e] criminal complaints with the Sheriff's department and Prosecutor's office for child abuse," and to contact government officials, local churches and schools, social service agencies, and community organizations "in an attempt to contact other victims and to help bring public awareness to the atrocities that take place in the Ripley and Dearborn County Courts." Id. at 9. And he concluded the motion by seeking relief "due to fraud" by the Judge, the Doctor, and opposing parties and counsel—and echoing his previous efforts seeking Judge Taul's recusal, he further demanded "the immediate resignation of Judge James D. Humphrey from the bench for the horrendous crimes committed against the Respondent and his children." Id. at 10.

If taken literally, those statements are defamatory *per se* because they impute judicial misconduct. Heeb v. Smith, 613 N.E.2d 416, 419 (Ind. Ct. App. 1993). Yet actual malice does not hinge on whether Defendant's claims are true or false, nor even whether they are objectively reasonable. Garrison, 379 U.S. at 79 ("The [actual malice] test . . . is not keyed to ordinary care . . . ."). Instead, it is a matter of his subjective sincerity—whether he "in fact entertained serious doubts as to the truth

10

of" those statements, Thompson, 390 U.S. at 731, or had a "high degree of awareness of their probable falsity," Garrison, 379 U.S. at 74, even if he was motivated by ill will, id. at 78–79. Here, there is no evidence that Defendant ever subjectively entertained such doubts—nor is it likely that he ever would, since as the Doctor concluded and the divorce court found, Defendant is "self-centered" and "has difficulty seeing an issue from another's perspective." Ex. 140 (Decree, Finding 8(K)). Whether his beliefs were reasonable is irrelevant—without proof that he *actually* doubted his assertions about the Judge, the First Amendment forbids using those statements as a basis for civil or criminal liability.

A reasonable-person inquiry does matter on a more fundamental level, though—determining whether Defendant's assertions were defamatory in the first place. A statement is not defamatory unless it conveys a defamatory imputation *of fact*—and "loose, figurative, or hyperbolic language [may] negate the impression that the writer was seriously maintaining" that his assertion is factual. Milkovich, 497 U.S. at 21. For example, a parody advertisement crudely portraying a prominent televangelist as having engaged in "a drunken incestuous rendezvous with his mother in an outhouse" is so obviously farfetched that no reasonable person could take it seriously as fact. See Falwell, 485 U.S. at 48, 57. But an editorial asserting that a local high school football coach "lied at [a] hearing after . . . having given his solemn oath to tell the truth" is not hyperbolic enough to negate a reasonable "connotation that petitioner committed perjury" because that contention is "sufficiently factual to be susceptible of being proved true or false," and thus defamatory. Milkovich, 497 U.S. at 5, 21 (alteration in original) (internal quotation marks omitted).

Here, though Defendant sincerely (albeit unreasonably) believed his statements were factual, we believe that in the context of a divorce decree, reasonable readers would understand "child abuse" or "abducting" as Defendant's exaggerated opinion of the decree's custody ruling—not factual assertions that the Judge actually beats or kidnaps children. And though it is a closer call, we doubt reasonable readers would take Defendant's claims of "revenge" or other improper motives for the ruling as much more than losing litigants' common lament that "the Judge was just out to get me." When a statement is reasonably susceptible of both defamatory and non-defamatory meanings, we leave that determination to the jury, Bandido's, 712 N.E.2d at 457—but under independent constitutional review in this criminal case, we must also be persuaded for ourselves that the evidence proves Defendant's guilt beyond a reasonable doubt. And on this record, we cannot agree that Defendant's claims would reasonably be understood as assertions of fact, rather than mere

11

hyperbolic opinion. Even apart from the failure to prove actual malice, Defendant's child-abuse and child-abducting claims may not form the basis of a conviction here.

None of this is a defense of Defendant's conduct. But free speech principles would be meaningless if they ceased to apply when a statement is ignorant, offensive, or unfair. Indeed, that is when the need for free-speech protection is at its greatest. The First Amendment is broad enough to protect "Priests Rape Boys" picket signs as protected political speech in connection with a funeral Mass for a fallen soldier. Snyder v. Phelps, __ U.S. __, 131 S. Ct. 1207, 1213, 1216–17 (2011). And it is broad enough to protect the crude "outhouse rendezvous" parody in Falwell. 485 U.S. at 57. It is therefore certainly broad enough to protect Defendant's ill-informed—but by all indications, sincere—beliefs that the Judge's child-custody ruling constituted "child abuse" or "child abducting," and that the ruling was based on improper motives. The Court of Appeals erred in relying on Defendant's overheated rhetoric about "child abuse," or the falsity of that characterization, to affirm his conviction for intimidating a judge. Even if Defendant's "child abuse" and other statements about the Judge could be understood as assertions of fact, not hyperbole, they are protected by the First Amendment because there is no proof of actual malice.

## B. The Doctor

The actual-malice standard at least arguably applies to Defendant's statements about the Doctor as well, though for different reasons. As with the Judge, Defendant's statements about the Doctor impute professional misconduct and are therefore defamatory *per se*. Henrichs v. Pivarnik, 588 N.E.2d 537, 542 (Ind. Ct. App. 1992). Defendant repeatedly used various websites to accuse the Doctor, more or less, of skewing his custody recommendation out of animus—of being "crooked," Ex. 186; having improper motives for remaining in the divorce case, see Ex. 191; committing "criminal conduct," Ex. 181; using children "as prostitutes for . . . financial gain," see Ex. 180; being a "child abuser" who "hurt[s] children," Ex. 179; "actively work[ing] to hurt children and parents," Ex. 166; and that the Doctor "won't quit. He wants to hurt me . . . because I continue to demonstrate that he doesn't follow the law," Ex. 191. And perhaps the harshest of all, he accused the Doctor of being a "pervert" and "using [custody] evaluations as a means to gain some kind of perverted sexual stimulation by asking the children's mothers explicit questions about their sex lives." Ex. 197.

But despite being defamatory, those statements may be protected by the actual-malice standard as a matter of Indiana law—even though the Doctor is not a public figure. We have extended

12

the stringent <u>New York Times</u> standard to "defamation cases involving matters of public or general concern," even if the victim is a private figure. <u>Bandido's</u>, 712 N.E.2d at 449, 452 (citing <u>Aafco Heating & Air Conditioning Co. v. Nw. Publ'ns, Inc.</u>, 162 Ind. App. 671, 321 N.E.2d 580 (1974), <u>cert. denied</u>, 424 U.S. 913 (1976)). Determining whether a controversy is of public or general concern is a question of law for the court. <u>Bandido's</u>, 712 N.E.2d at 452 n.7. Unlike the public-health restaurant inspections at issue in <u>Bandido's</u>, expert testimony primarily affects only the private litigants in a particular case, and is "public" only to the extent that the proceedings in that case were open to the public. Out of an abundance of caution, though, we will assume *arguendo* that if a psychologist actually were abusing his position of trust to give corrupt expert testimony or for personal gratification, it would be a matter of public or general concern. Under that assumption, the actual-malice standard would apply to protect Defendant's public or online comments about the Doctor, as well,[5] because there is no evidence that Defendant in fact subjectively doubted his accusations—regardless of whether an objectively reasonable person would have.

## C. Enforceability of the Intimidation Statute Generally

As the discussion above illustrates, the "actual malice" standard is so steep that prosecutions involving public figures or issues of public concern under Indiana Code section 35-45-2-1(c)(6) or (7) are all but impossible. When a "threat" of ridicule or embarrassment is made against a public figure, <u>New York Times</u> applies as a matter of federal law—and if the speech implicates an issue of public concern, <u>Bandido's</u> applies as a matter of Indiana law. In either event, proof of "actual malice" is required for a conviction to survive constitutional scrutiny. Only where a purely-private figure is involved, *and* the alleged "threat" involves no colorable issue of public concern, may subparts (c)(6) and (7) be applied as written; and otherwise, the actual malice standard will preclude most prosecutions. As a result, the State will often be well-advised to avoid bringing charges under those subparts—or even including them in jury instructions, for reasons discussed in Part III.A below—when, as here, it could rely on other subparts that do not implicate actual malice.

---

[5]  The Court of Appeals also relied on the "frequency and tone" of those comments, as well as Defendant's long-running private barrage of faxes and letters to the Doctor as constituting a coercive level of harassment sufficient to find attempted obstruction of justice. We express no opinion on that issue because we find a "true threat" as discussed in Part II below.

13

## II. "True Threats," as Identified in Context, Are Not Protected Speech

Not all forms of intimidation are limited by the actual-malice standard. To the contrary, "the First Amendment . . . permits a State to ban a 'true threat'"—that is, a "statement[] where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." Black, 538 U.S. at 359 (citing Watts v. United States, 394 U.S. 705, 708 (1969) (*per curiam*)). The "intent" that matters is not whether the speaker really means to carry out the threat, but only whether he intends it to "plac[e] the victim in fear of bodily harm or death." See Black at 359–60 (citing R.A.V. v. City of St. Paul, 505 U.S. 377, 388 (1992)).

The speaker's intent, then, is often the deciding factor between whether a communication is "constitutionally proscribable intimidation" or protected "core political speech," Black, 538 U.S. at 365. For example, in Watts, a young man told a small group at a political rally that he had received a draft card for service in the Vietnam War, but he would not report for his physical: "I am not going. If they ever make me carry a rifle the first man I want to get in my sights is L.B.J. They are not going to make me kill my black brothers." 394 U.S. at 706 (internal quotation marks omitted). In response, the crowd laughed. Id. at 707. The Supreme Court reversed the speaker's conviction for "knowingly and willfully threaten[ing] the President," concluding his comments were only "political hyperbole," not a true threat. Id. at 706–08. Though the *per curiam* opinion does not offer a detailed rationale, the audience's laughter suggests that the statement in context was not meant to be taken seriously.

But Black expressly recognized the importance of *context* to distinguish a true threat from protected speech. There, the high Court recognized that cross-burning is often intended for the prohibited purpose of making its targets fear for their lives, Black, 538 U.S. at 357, but is sometimes "a symbol of group solidarity . . . directed at a group of like-minded believers"—in which context, it "would almost certainly be protected expression," id. at 365–66 (quoting R.A.V., 505 U.S. at 402 n.4). The Court therefore observed that a factfinder must consider "all of the contextual factors . . . to decide whether a particular cross burning is intended to intimidate." Id. at 367.

Both before and after Black, courts have emphasized that assessing true threats is highly dependent on context. As the Seventh Circuit has long recognized, "Written words or phrases take their character as threatening or harmless from the context in which they are used, measured by the common experience of the society in which they are published." United States v. Prochaska, 222 F.2d 1, 2 (7th Cir. 1955); accord, e.g., United States v. Turner, 720 F.3d 411, 426 (2d Cir. 2013), cert.

pending (approving of jury instruction including identical language). Particularly with implied threats, then, juries are not bound to "rigid adherence to the literal meaning of a communication" while turning a blind eye "to its reasonable connotations derived from its ambience"—because doing so "would render [prohibitions on threats] powerless against the ingenuity of threateners who can instill in the victim's mind as clear an apprehension of impending injury by an implied menace as by a literal threat." United States v. Malik, 16 F.3d 45, 50 (2d Cir. 1994) (citing Prochaska, 222 F.2d at 2). Nor are juries "preclude[d from] finding . . . a threat any time the defendant can conjure up some conceivable alternative explanation for his words." United States v. Shoulberg, 895 F.2d 882, 885 (2d Cir. 1990). The true meaning of a facially ambiguous threat is for a jury to decide, as long as the State presents "sufficient extrinsic evidence, capable of showing beyond a reasonable doubt that an ordinary and reasonable recipient *familiar with the context* of the [statement] would interpret it as a threat." Malik, 16 F.3d at 50 (emphasis added).

Similarly, we rely here on the full context of Defendant's statements and conduct to determine whether they were merely political hyperbole or actually intended as true threats. Because threats, particularly veiled threats, are heavily dependent on "all of the contextual factors," Black, 538 U.S. at 367, we doubt any rigid formula can fully capture the distinction between protected speech and unprotected threats. Some courts apply a purely objective test, inquiring only whether in context, "the recipient could reasonably have regarded the defendant's statement as a threat"—reasoning that a "threat is not a state of mind in the threatener; it is an appearance to the victim." United States v. Schneider, 910 F.2d 1569, 1570 (7th Cir. 1990) (internal quotation marks and citation omitted); accord, e.g., Turner, 720 F.3d at 420 ("This Circuit's test for . . . a true threat is an objective one— namely, whether an ordinary, reasonable recipient who is familiar with the context of the communication would interpret it as a threat of injury.") (internal quotation marks and substitution omitted).

But Defendant asks us to also consider whether he *intended* to put his targets in fear for their safety. We believe his suggestion is consistent with Black's focus on "whether a particular [communication] is *intended* to intimidate," 538 U.S. at 345 (emphasis added)—and consistent with "our strong commitment to protecting the freedom of speech and expression" as a matter of Indiana law, even beyond what the First Amendment requires. Bandido's, 712 N.E.2d at 451–54 (adopting actual malice standard for defamation claims brought by private figures relating to issues of public concern, exceeding First Amendment protections); see also Gertz v. Robert Welch, Inc., 418 U.S. 323, 347 (1974) ("[S]o long as they do not impose liability without fault, the States may define for

15

themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual."). We therefore hold that "true threats" under Indiana law depend on two necessary elements: that the speaker intend his communications to put his targets in fear for their safety, and that the communications were likely to actually cause such fear in a reasonable person similarly situated to the target. We conclude there is ample evidence on both points as to both victims.

## A. Evidence of Defendant's Intent to Threaten

We begin by looking to evidence of Defendant's intent to threaten the Judge—whether his statements were meant to be threatening, not just innocently misunderstood, as gleaned from "all of the contextual factors." Black, 538 U.S. at 367. Such a *mens rea* determination "is almost inevitably, absent a defendant's confession or admission, a matter of circumstantial proof." Hampton v. State, 961 N.E.2d 480, 487 (Ind. 2012). But even in cases that implicate free-speech protection, we trust juries to make such inferential decisions—for example, "[i]f a statement is susceptible to both defamatory and non-defamatory meanings, the matter of interpretation should be left to the jury." Bandido's, 712 N.E.2d at 457. The jury plays a similar role in considering "all of the contextual factors" under Black to interpret whether an alleged veiled threat was actually intended as a "true threat"—subject, of course, to our duty of "independent and searching review of the record," id. at 454–55 (citing New York Times, 376 U.S. at 285), to ensure that free-speech protections are not obscured by deference to the jury.

Our independent review begins with whether the speaker knew the statements at issue were likely to be perceived as threatening. Because of the inferential nature of circumstantial evidence, that *mens rea* question will often depend on whether a reasonable person would recognize the statements' threatening potential. That inquiry also recognizes the inherent fact-sensitivity of implied threats—where even a single detail can transform otherwise protected speech into an unprotected threat. For example, a detailed and gruesome "fantasy" posted online about raping and murdering a young woman would generally be protected speech—but when the story (and the victim it describes) is named after a female classmate of the author, it may become a "true threat" against her. Jennifer E. Rothman, Freedom of Speech and True Threats, 25 Harv. J.L. & Pub. Pol'y 283, 351–52 (2001) (citing United States v. Alkhabaz, 104 F.3d 1492 (6th Cir. 1997)). Regardless of whether the author "purposefully intended to intimidate his classmate, he would certainly have known that if she read

16

the story she would be intimidated by it, given its gruesome and explicit nature," and "because [he] posted the story on a public website and used his classmate's name as the title, . . . the victim would [likely] receive the threat." Id. at 352. Again, we must leave room for a jury to use its reasonable judgment about "all of the contextual factors." See Black, 538 U.S. at 367. And here, the context shows that Defendant not only knew that his victims would be placed in fear, but purposefully intended that result—indeed, as discussed below, he directly admitted both points.

### 1. *The Judge*

Since Defendant never stated an overt threat against the Judge, we begin by examining the circumstantial evidence to determine whether Defendant knew his actions would be understood as a threat. In that regard, we find Defendant's publication of the Judge's home address to be particularly telling—not least, because Defendant's perjury to the grand jury about his purpose in doing so implies that truthful testimony on that point would have been incriminating. And even apart from his perjury, the context strongly suggests that Defendant could only have intended the address as a hint to the Judge that Defendant's campaign would not stop with mere criticism, but would instead jeopardize his family's safety in their own home. That context includes, but is not limited to, Defendant's concern that a perceived adversary knew where his mother lived, his volatile courtroom conduct, and his recognition that his targets had already become genuinely concerned by his behavior.

At the outset, we observe that Defendant's pretext for directing ethics complaints about the Judge to "the Ethics & Professionalism Committee Advisor located in Dearborn County, Indiana," but at her (and thus, the Judge's) otherwise-unpublished home address, is utterly implausible. Exs. 142, 160. Defendant had no difficulty directing his complaints to appropriate authorities—for example, his voluminous and repeated complaints about the Doctor to the Kentucky Board of Psychiatry. E.g., Exs. 54, 60. It is highly unlikely, then, that he would overlook the conspicuous links on the Indiana Judiciary website for filing judicial ethics complaints, yet through sheer inadvertence find a title once held by the Judge's wife and connect it to a residential address in a small Indiana town. Compare Tr. 275–77 (witness demonstration of judiciary website) with Tr. 405–08 (witness demonstrating county assessor website). And again, the jury apparently reached the same conclusion, convicting Defendant of perjury for feigning ignorance in his grand-jury testimony of whether Heidi Humphrey was the Judge's wife, and that her address was his address.

17

Indeed, Defendant himself recognized the threatening potential of a perceived adversary knowing a loved one's address. Just two months after publicizing the Judge's address, Defendant wrote a letter to various law enforcement officials in which he expressed concern that a police detective knew where Defendant's mother lived:

> I was disturbed to get a voice message on October 8, 2009, from someone alleging [*sic*] to be a detective from the Dearborn County Special Crimes Unit. . . . The message said someone filed a complaint. . . . The man would not tell me who made the complaint or any details of the complaint; he just wanted to meet me. Even more disturbing, he indicated that he knew that my mother lived in Cincinnati; [*sic*] which is distressing given the level of judicial vindictiveness coming out of Judge Humphrey's courtroom.

Ex. 89 at 6. If Defendant found it threatening that a law-enforcement officer knew his mother's address, he surely recognized that the family of a public figure who had sentenced (and before that, prosecuted) violent criminals would be no less concerned by an angry, vindictive person knowing and broadcasting *their* address. Several cases, too, have recognized that publishing a victim's address (whether work or home) can often have threatening implications. E.g., Turner, 720 F.3d at 422–23 (finding true threat based in part on blogger's publication of Seventh Circuit Judges' office addresses, and threat to publish their home addresses); United States v. Pacione, 950 F.2d 1348 (7th Cir. 1991) (finding true threat based in part upon defendant "asking for [IRS officer's] boss' home address," and telling officer that "he knew where she lived and her home phone number"). See also Shoulberg, 895 F.2d at 885–86 (asking for potential witness's address, coupled with expression of hope that witness was not cooperating with law enforcement, established an attempted threat, even if neither fact individually would have sufficed).

The facts and circumstances known to Defendant at the time he made his threats further imply that he knew his communications would be threatening. He knew the Judge considered him dangerous—not only from the findings in the divorce decree about his psychological disturbance and "playing with gas and fire," but also from the Judge's admonitions to Defendant about his violent and volatile courtroom behavior that resulted in a sheriff's deputy being stationed behind Defendant throughout the final hearing. Defendant also knew that his similar course of conduct against the Doctor had, as discussed below, caused the Doctor to seek "protection" from the court against Defendant's behavior, Ex. 67 at 3–4, and to conclude that Defendant was "potentially

dangerous," Ex. 132 at 7. Indeed, Defendant's "Motion to Clarify and to Reconsider" recognized that his "outbursts . . . were arguably extreme and/or unwarranted"—though he deflected responsibility by blaming his behavior on his "inability to legally inspect and cross-examine [*sic*] the information behind" the Doctor's conclusions. Ex. 141 at 3. Then just four days later, Defendant filed his "Motion for Relief from Judgment and Order" reciting the Judge's home address and posted it online to publicize it under the obvious pretext of encouraging judicial-ethics complaints. Under the circumstances known to Defendant, there is no reasonable doubt that he knew his statements were threatening. Ex. 160.

But for all the strength of that circumstantial evidence, the strongest evidence here is direct: that Defendant declared—indeed, emphasized—his threatening intent in a letter to the children's treating therapist that he attached to his reply in support of the "Motion for Relief from Judgment":

> I have always said that I would hold everyone accountable for any unethical and/or illegal conduct in matters dealing with my children. *Some would argue that this appears threatening. I would argue that it is a promise.* People have accused me of trying to intimidate psychologists, lawyers, and judges. . . . If I have done anything wrong, I would suggest that these people contact the proper authorities and file charges or retain an attorney and sue me.

Ex. 148 at Ex. A at 5 (emphasis added.) Even if "it's not a threat, it's a promise" might otherwise be mere schoolyard bravado, it was legitimately menacing in view of his then-recent violent and uncontrolled courtroom behavior, diagnosis of psychological disturbance and dangerousness, veiled references to arson and skill in the use of firearms, and long-running expressions of hostility towards the Judge—all of which the Judge was well aware of through the divorce proceedings.

In sum, Defendant's reason for publicizing the Judge's address was clearly pretextual; he implicitly recognized that broadcasting the Judge's address was threatening by declaring concern on his mother's behalf about a far less public disclosure; and he directly acknowledged that his statements could readily be perceived as threatening. And he did all these things shortly after demonstrating violent and uncontrolled behavior in the courtroom, knowing that the Judge had already perceived him to be dangerous and unstable. We are persuaded beyond any reasonable doubt that Defendant was well aware of—and indeed, fully intended—the threatening implications of his communications and actions towards the Judge.

19

*2. The Doctor*

Defendant's own words also provide insight into his *mens rea* in threatening the Doctor—in fact, he directly expressed his intent, or at least strongly implied it, on several occasions. In September 2008, the Doctor asked the trial court for "some protection" from Defendant because the tone of his frequent faxes (often multiple times per day) was becoming more repetitive, aggressive, and provocative—citing Defendant's statement that "the game is over[,] Dr. Connor" as "rather threatening." Ex. 67. Defendant responded by taunting the Doctor for seeking unspecified "protection" from the divorce court instead of a restraining order, Ex. 51, then repeating the "game is over" threat a couple of months later, couched in a self-serving "Legal Disclaimer":

> I'd say the game is over but you may send it to the Court complaining about me threatening you. Heck with it, the game is over Dr. Connor. **[Legal Disclaimer: this is not to be perceived as any threat to Dr. Connor no matter how hard he tries to use psychological jargon or "interpretation" in an effort to make him appear to be a victim in this matter. . . .]** The game is over because you have done your best to try to stomp me out and I am standing tall. . . .
>
> The game IS over Dr. Connor. Don't bother running to another court looking for pity. . . .

Ex. 59 (square brackets and boldface original).

About a month after that purported "disclaimer," Defendant largely ceased communicating to the Doctor directly and instead shifted his focus to using websites he created to publicize his complaints about the Doctor. In one of his early posts, he again implicitly acknowledged that his behavior had been threatening—and that his goal was indeed to obstruct justice by discouraging the Doctor's testimony: "Ask yourself why [the Doctor] is working so hard to stay involved in this case. *He could have easily said that he felt threatened by me* so he was withdrawing from the case." Ex. 191 (emphasis added.) For the next several months, Defendant posted frequently, see generally Exs. 188 & 190–91, accusing the Doctor of various wrongdoing and including a warning that "[t]his is not going to end well," Ex. 188. (Those Internet posts became an issue in the divorce case, Exs. 127–29 (various pre-hearing motions), 140 (Decree, Finding 8(N)), and the Doctor was aware of them, see Tr. 93–98, 137–38, 150–58.)

Defendant's threats did not subside even after the final divorce decree was issued, detailing Defendant's pattern of intimidation toward the Doctor (and others involved in the divorce) and

restricting parenting time because of the safety concerns it raised. To the contrary, he doubled-down on that behavior, escalating his rhetoric into increasingly personal attacks—accusing the Doctor of being a "[p]ervert" and "sexual predator," Ex. 181, daring him to "[c]owboy up" and "[q]uit hiding," Ex. 182. Those writings culminated in a reference to physical violence against the Doctor, veiled in a comparison to likely reactions to a hypothetical angry review of a plumber:

> *"That lousy son of a bi#$h, Dr. Custody Evaluator, lied in his report. He made me so mad I wanted to beat him/her senseless. The dirty piece of S\*@T would not honor his/her contract . . . . Every time I think about the evaluation report . . . it makes me want to punch Dr. Custody Evaluator in the face."*
>
> Rather than say, "There's no way I would use Dr. Custody Evaluator", [*sic*] the social worker, psychologist, and/or judge may begin to think that the person who wrote the review is a danger to their own children . . . .
>
> No one has ever lost the ability to see their own children because they wrote an angry review of a plumbing company. Why should someone's parenting abilities be questioned if they write an angry review of a custody evaluator? That's what happened to me; except I have never written about any thoughts of causing physical harm to someone.

Ex. 177 at 2–3. Then about a month later, Defendant demonstrated his knowledge of the Doctor's home address in a post identifying the bank holding the Doctor's home mortgage, the name of his subdivision, and the street name (conspicuously emphasized within a play on words). Ex. 199 at 1–2. The post continued, "There are some nice houses on his street. I have family that lives a couple streets over from Dr. Connor. I wonder if I should warn my family's neighborhood about the troubles within the family court system?" Id. at 1. And several months after that, Defendant demonstrated his ability to find the Doctor away from either his office or his home, by appearing at an unrelated hearing in which the Doctor was testifying—announcing on his blog that his presence had made the Doctor "a little nervous" because "[a]s a psychologist, he probably believes that *aggression or violence* would be a common reaction for parents who had their children ripped from them without any warning or justifiable reason." Ex. 200 (emphasis added).

The context of Defendant's identification of the Doctor's home address, much like the Judge's, supplies a clear threatening implication for statements that would otherwise be far more ambiguous. Defendant knew that his obsessive and harassing conduct leading up to the final hearing had already intimidated the Doctor to the point of seeking "protection" from the trial court;

21

and that the Doctor had reached the professional conclusion that Defendant had "a degree of psychological disturbance that is concerning." His subsequent conduct towards the Doctor served only to amplify the behavior that led to those conclusions. Even if all the rest of Defendant's statements were only ambiguously threatening—his self-serving attempt to "disclaim" threatening intent, his express recognition that the Doctor "could have easily said that he felt threatened" by his conduct, and his escalating rhetoric into descriptions of "beating senseless" a supposedly hypothetical custody evaluator—they clearly formed part of a complete threat when Defendant announced that he knew where the Doctor lived. That threat then became even more forceful when Defendant followed the Doctor to an unrelated hearing knowing it would make him "a little nervous." Taken in full context, we are convinced beyond a reasonable doubt that Defendant not just knew, but fully intended, that he would make the Doctor fear being attacked in his own home—a classic true threat.

## B. Reasonable Perception of Threats Under Similar Circumstances

Besides the speaker's intent to threaten, the other necessary element of a "true threat" is whether the communications at issue would be likely to cause a reasonable person, similarly situated to the victims, to fear for the safety of themselves or someone close to them. Making that determination from the perspective of an objectively reasonable person ensures that harsh, but otherwise protected, speech will not become punishable merely by being directed towards a hypersensitive or unreasonably fragile target. Yet particularly when the alleged threats are only implied, as here, the inquiry must also account for what a reasonable person would perceive *if similarly situated* to the victim—since the particular facts and circumstances known to each victim are the very facts from which threatening implications are generally drawn. So in effect, what is often called a "reasonable listener" test is best understood, at least in the context of implied threats, as a "reasonable victim" test—whether it was *objectively* reasonable for the victim to fear for their safety.

### 1. The Judge

An objectively reasonable person in the Judge's situation would recognize Defendant's statements as threatening, and the Judge was amply reasonable to perceive them as such. First, reasonable people would take into account their own knowledge about the person making threats against them to determine whether they should take the threats seriously. And in doing so, they would reasonably consider how Defendant's rhetoric had escalated: When relatively mild criticism

and relatively straightforward motions failed to accomplish his goals, he progressed into angry (albeit protected) hyperbole about "child abuse" and judicial corruption; then into ominous invective about being an "accomplished pyromaniac" for whom the divorce and custody dispute was like "gas and fire," Ex. 140 (Decree, Finding 8(O)); then into increasingly irrational, paranoid, and personal accusations of corruption, mail fraud, and RICO conspiracies by anyone he perceived as an adversary, e.g., Ex. 208; then to declaring himself a "martyr," Ex. 148 at Ex. A at 4, and a victim of "horrendous crimes," Ex. 142 at 10; and repeatedly vowing to "hold accountable" his perceived adversaries, e.g., Exs. 67, 148 at 10, 160 at 8, 181 at 2. Defendant's long-running angry criticism, even the portion that is protected speech, remains relevant as part of that larger contextual consideration—both as part of the pattern of escalation, and because reasonable people necessarily take an ambiguous threat more seriously when it comes from someone who holds a longstanding grudge.

Reasonable people in the Judge's situation would also view Defendant's erratic, volatile, and violent courtroom behavior—"yell[ing] out things," "thr[owing] his papers" and shouting "I demand justice in this courtroom," and "laughing inappropriately," Tr. 319—as part of that pattern of escalation. As the Judge described that behavior:

> I've never seen anything quite like it in all my years of practice and as a Judge. It was . . . constant rehashing of this almost obsession with Dr. Connor . . . , I recall specifically at the end of that hearing, I had to threaten Mr. Brewington with contempt of court because of him slamming things on the table . . . .

Tr. 224. Indeed, the Judge "threatened [Defendant] with contempt multiple times and . . . had a police officer in the courtroom behind him during the entire proceedings"—the first time he had ever felt such precautions necessary in a divorce final hearing. Tr. 237–38. And reasonable people would, just as the Judge did, consider Defendant's demonstrated obsessiveness as part of the context of his increasingly hostile and menacing words and actions—and would consider the Doctor's professional opinion that Defendant "is potentially dangerous given his profile and behavior thus far," Ex. 132 at 7—as evidence that the threat of violence was serious.

In sum, a reasonable person similarly situated to the Judge would be wary of Defendant's demonstrated obsessiveness, mental disturbance, and instability; his veiled references to pyromania and weapons training; his pattern of escalating rhetoric and increasingly personal attacks; and his volatile and violent in-court behavior. And any lingering doubt as to whether the threat was

23

worth taking seriously was erased when Defendant publicized the Judge's home address. In the context of his other behavior, that additional step completed a true threat by implying to any objectively reasonable person that Defendant intended to menace the Judge not just in the courtroom, but in his living room as well. That perception is further borne out by the Judge's subjective reaction—having an old firearm repaired to have at the ready, installing a home security system, requesting additional police patrols in his neighborhood, notifying security at his son's college, and arranging police escorts for his wife's commute to work. Tr. 252–55. Those are not the actions of a person who merely fears being exposed to criticism or ridicule; they are the actions of a person who fears for his family's physical safety—and in view of what the Judge knew about Defendant, we find his fear was objectively reasonable. Defendant's actions toward the Judge therefore constituted a "true threat" beyond the scope of free-speech protection.

### 2. The Doctor

Likewise, a reasonable person similarly situated to the Doctor would also be amply justified in perceiving Defendant's behavior as a threat to physical safety. Defendant exhibited an even longer-running campaign of obsessive and escalating behavior towards the Doctor than towards the Judge. Even his initial, seemingly innocent requests for a copy of the Doctor's file were preceded by a threatening anonymous letter that is highly consistent with Defendant's writing style. Ex. 33. When those requests failed to accomplish Defendant's goal, he quickly escalated first to threats (sometimes several per day) of pursuing professional discipline, of civil contempt and lawsuits against the Doctor, of lawsuits against the Doctor's business partners and employees, and of criminal prosecution. See generally Exs. 38–42, 44–45, 48–51. When those efforts also proved fruitless, Defendant began obsessively gathering and publishing personal information about the Doctor—his father, Ex. 193; his civic pursuits, Exs. 179, 197; his involvement in other cases, Ex. 169; and eventually even a private family photo, Tr. 201, Ex. 201—and sustained that campaign for several years. Despite their disconcerting extent and duration, those acts standing alone might arguably constitute no more than "criminal defamation" protected as free speech under Bandido's absent a showing of actual malice.

But reasonable people in the Doctor's situation would not view those acts in a vacuum. Just as with the Judge, Defendant's statements—even the ones that were protected speech—demonstrate an anger and obsessiveness that bears on how seriously a reasonable person would take an otherwise ambiguous threat. Reasonable people would consider that anger and obsession in light of the psychometric test results indicating that Defendant suffers "a degree of psychological disturbance

24

that is concerning," Ex. 9 at 28—thus implying in turn that Defendant is unstable and dangerous. Therefore, as with the Judge, what might otherwise have been merely distasteful, hyperbolic criticism took on genuinely threatening implications when Defendant announced that he knew where the Doctor lived, Ex. 199 at 1–2—and even more so when, a few months later, Defendant followed the Doctor to another hearing in an unrelated case, Ex. 200; and still more so when a few months after that, Defendant publicized a private family photo of the Doctor, Ex. 201. Those additional steps would imply to any reasonable person that Defendant was not merely angry, and not merely threatening to expose what he perceived as corruption or cronyism—but rather, that he intended to make the Doctor fear for his physical safety wherever he went, whether at his office, in the witness stand, or at his home. In fact, that was exactly how the Doctor explained his fear, testifying that "with nothing else around [the statements] . . . I would maybe see it differently[,] but it's the accumulation of these types of comments and events" that he, "as a person who deals with aggressive people, . . . found . . . to be disturbing." Tr. 189–90. And consistent with that reasonable perception, the Doctor's family sought additional police patrols and discussed Defendant's threats with their children and co-workers—while keeping those threats secret from elderly family members who would be worried. Tr. 159–66, 203–04. Their reactions are precisely what we would expect of objectively reasonable people under similar circumstances—that, faced with statements and conduct Defendant intended to be threatening, they did in fact feel threatened and fearful for their family's safety. That is the essence of a "true threat" to which the United States and Indiana Constitutions accord no free-speech protection.

### III. General Verdict, Free Speech, and Invited Error

Defendant next argues that even if some of his speech was constitutionally unprotected, the jury instructions and general verdict were fundamentally erroneous (or constituted ineffective assistance of counsel) because they permitted the jury to convict him based in whole or in part on the constitutionally protected portions of his statements. He is correct that the instructions were erroneous and created a general-verdict error—but he affirmatively invited those errors as part of a perfectly reasonable trial strategy. When an error is invited for such legitimate reasons, it is neither fundamental error nor ineffective assistance of counsel.

#### A. General Verdicts and Free Speech Generally

Defendant argues that because the State's arguments relied at least in part on protected speech, his convictions must be reversed because it is impossible to tell whether the jury relied on

the protected or unprotected aspects of his speech—in other words, to tell whether he was convicted of true threats or mere "criminal defamation." Defendant bases this "general verdict" argument on Street v. New York, in which the defendant was charged under a statute that made it a misdemeanor "publicly to mutilate, deface, defile, or defy, trample upon, or cast contempt upon either by words or act any flag of the United States." 394 U.S. 576, 577–78 (1969) (internal substitutions omitted). The defendant's charging information was based upon both burning a flag (which the Court assumed without deciding to be unprotected[6]), and a protected statement he made while doing so: that he "did wilfully and unlawfully set fire to an American Flag and shout, 'If they did that to Meredith[7], [w]e don't need an American Flag.'" Id. at 579. Relying on Stromberg v. California, 283 U.S. 359 (1931), the Supreme Court concluded the statute "was unconstitutionally applied in appellant's case because it permitted him to be punished merely for speaking defiant or contemptuous words about the American flag." Id. at 581, 585–89. The Court held:

> [W]hen a single-count indictment charges the commission of a crime by virtue of the defendant's having done both a constitutionally protected act and one which may be unprotected, and a guilty verdict ensues without elucidation, there is an unacceptable danger that the trier of fact will have regarded the two acts as "intertwined" and have rested the conviction on both together.

Street, 394 U.S. at 588.

The Court rejected the State's argument that the protected speech was used only for the permissible purpose of proving the defendant's intent in burning the flag, because "[t]he State never announced that it was relying exclusively upon the burning" and the trial judge "never indicated during the [bench] trial that he regarded appellant's words as relating solely to intent." Id. at 589–90. (Nor was the speaker's intent really in controversy; he did not claim, for example, that he burned the flag because it was worn and required disposal.) The Court therefore reversed the conviction, because "[i]n the face of an information explicitly setting forth appellant's words as an element of his alleged crime, and . . . a statute making it an offense to speak words of that

---

[6]  Not until twenty years later did the Court recognize flag-burning as protected expressive conduct. Texas v. Johnson, 491 U.S. 397 (1989) (striking down state flag-desecration statute). See also United States v. Eichman, 496 U.S. 310 (1990) (striking down federal Flag Burning Act).

[7]  The defendant felt the government had done too little to protect civil rights leader James Meredith, who had been assassinated earlier that day. Street, 394 U.S. at 578–79.

sort," the record was "insufficient to eliminate the possibility either that appellant's words were the sole basis of his conviction or that [he] was convicted for both his words and his deed." Id. at 590.

The possibility of being convicted based on protected speech "intertwined" with unprotected conduct makes this case arguably similar to Street. But procedurally, a closer analogy is to Bachellar v. Maryland, 397 U.S. 564 (1970), involving Vietnam War protestors charged with disorderly conduct. Unlike Street, the charging information in Bachellar raised no general-verdict problem, because it alleged no specific facts, but only recited the statutory definition of the offense: "acting in a disorderly manner to the disturbance of the public peace, upon any public street." 397 U.S. at 564. Instead, the general-verdict problem arose from jury instructions that authorized conviction for *either* "the doing or saying or both of that which offends, disturbs, incites or tends to incite a number of people gathered in the same area," *or* for "refusal to obey a policeman's command to move on when not to do so may endanger the public peace," id. at 565—the former being protected expression, the latter being unprotected. There was conflicting evidence at trial about whether the protestors had obstructed the sidewalk by sitting or lying down and then refused police orders to move, or whether police had thrown the protestors onto the sidewalk and then held them down while arresting them. Id. at 568. The Supreme Court reversed the protestors' convictions because in light of the conflicting evidence and the jury instructions, the general verdict raised a possibility that the convictions may have rested on an unconstitutional basis:

> On this record, if the jury believed the State's evidence, petitioners' convictions could constitutionally have rested on a finding that they sat or lay across a public sidewalk with the intent of fully blocking passage along it, or that they refused to obey police commands to stop obstructing the sidewalk in this manner and move on. . . . [But] it is equally likely that the verdict resulted "merely because [petitioners' opinions were] themselves offensive to some of their hearers."

Id. at 571 (quoting Street, 394 U.S. at 592).

Like Bachellar, the grand jury's indictments against Defendant here do not allege any *particular* act or statement as constituting intimidation, instead alleging generally that his conduct as a whole "between August 1, 2007 and February 27, 2011" (as to the Doctor) and "between August 1, 2009 and February 27, 2011" (as to the Judge) was "intended to place[ them] in fear of retaliation for a prior lawful act." App. 22, 24. Nothing on the face of the indictments, then, creates confusion between protected or unprotected acts as the basis for conviction. Instead, like Bachellar,

27

any confusion arises only because of how the case was argued and how the jury was instructed. Specifically, the prosecutor argued two grounds for Defendant's convictions, one entirely permissible (true threat) and one plainly impermissible ("criminal defamation" without actual malice). See Tr. 455–56. Then, the jury was instructed on all eight alternative forms of "threat" under Indiana Code section 35-45-2-1(c), App. 16, without any instruction that for these particular victims, threats of "criminal defamation" under (c)(6) and (7) also require "actual malice." That makes it quite possible that the impermissible criminal-defamation theory formed at least part of the basis for the jury's guilty verdicts, and the general verdict cannot indicate otherwise. Accordingly, Bachellar compels us to find a general-verdict error here—but as discussed below, Defendant invited that error as part of a reasonable defense strategy, and therefore may not raise it as grounds for relief.

## B. Invited Error and Fundamental Error

As Defendant recognizes, his trial counsel did not object to the general verdict forms, nor seek jury instructions on the "actual malice" standard. Instead, he simply asked for the jury to be instructed on the *verbatim* text of the First Amendment and Article I, Section 9 of the Indiana Constitution. Failure to timely raise issues at trial ordinarily forfeits them for appeal, Jewell v. State, 887 N.E.2d 939, 940 n.1 (Ind. 2008). Defendant therefore seeks to avoid waiver by arguing that those failures constituted either fundamental error or ineffective assistance of counsel—but instead, we find invited error, which precludes relief on either theory.

In this context, fundamental error and ineffective assistance are closely related. "While we frame the standard for ineffective assistance of counsel and fundamental error in somewhat different terms[,] . . . they will invariably operate to produce the same result where the procedural posture of the claim is caused by counsel's failure to object at trial." McCorker v. State, 797 N.E.2d 257, 262–63 (Ind. 2003) (footnote omitted). As we have previously recognized, "fundamental error requires a showing of at least as much prejudice to the defendant as a claim of ineffective assistance of counsel," and so "finding that [a d]efendant was not denied the effective assistance of counsel also establishes that the alleged error was not so prejudicial as to constitute fundamental error." Culver v. State, 727 N.E.2d 1062, 1070 & n.7 (Ind. 2000) (citing Rouster v. State, 705 N.E.2d 999, 1008 n.8 (Ind. 1999), reh'g denied).

But the two principles overlap in a second way we have not previously discussed—because deficient performance by counsel, which is the *express* premise of an ineffective-assistance claim,

28

is also *implicit* in fundamental error. A "finding of fundamental error essentially means that the trial judge erred . . . by not acting when he or she should have," even without being spurred to action by a timely objection. Whiting v. State, 969 N.E.2d 24, 34 (Ind. 2012). An error blatant enough to require a judge to take action *sua sponte* is necessarily blatant enough to draw any competent attorney's objection. But the reverse is also true: if the judge could recognize a viable reason why an effective attorney might not object, the error is not blatant enough to constitute fundamental error. And when a passive lack of objection (here, to the "threat" instruction) is coupled with counsel's active requests (here, for other related instructions), it becomes a question of invited error.

And on that basis, we find invited error here. The fundamental error doctrine is rooted in waiver, as "an exception to the general rule that the failure to object at trial constitutes a procedural default precluding consideration of an issue on appeal." Jewell, 887 N.E.2d at 940 n.1. It allows us to nevertheless address "an error that ma[de] a fair trial impossible or constitute[d a] clearly blatant violation[] of basic and elementary principles of due process presenting an undeniable and substantial potential for harm," Clark v. State, 915 N.E.2d 126, 131 (Ind. 2009)—that is, under "egregious circumstances," Brown v. State, 929 N.E.2d 204, 207 (Ind. 2010). By contrast, the "doctrine of invited error is grounded in estoppel," and forbids a party to "take advantage of an error that [he] commits, invites, or which is the natural consequence of [his] own neglect or misconduct." Wright v. State, 828 N.E.2d 904, 907 (Ind. 2005). At bottom, then, fundamental error gives us leeway to mitigate the consequences of counsel's oversights, but invited error precludes relief from counsel's strategic decisions gone awry.

Here, counsel's lack of objection to the general verdict appears to have been part of a conscious "all or nothing" strategy. One common example of such a defense arises in murder cases, when a defendant chooses not to have the jury instructed on the lesser included offense of voluntary manslaughter, so that any shortfall in the State's proof of *mens rea* will result in complete acquittal, rather than merely a lesser conviction. E.g., Conner v. State, 711 N.E.2d 1238, 1250 (Ind. 1999) (defense counsel could have reasonably decided to seek acquittal based on the State's failure to prove intentional murder instead of arguing for the lesser offense of voluntary manslaughter). In a similar vein, Defendant here chose to withdraw a proposed final jury instruction on harassment as a lesser included offense of intimidation, Tr. 441; 2d Supp. App. at 18, arguing instead that *all* his statements were intended only as protected opinions on an issue of public concern, or petitions for redress of grievances, and not to cause fear or for any other threatening purpose, Tr. 488–89. In

effect, that approach sought to exploit the prosecutor's improper reliance on "criminal defamation" to the defense's advantage—focusing the jury on the clearly protected aspects of Defendant's speech, and on that basis to find the ambiguous aspects of his conduct to be protected as well.

Instructing the jury on the text of the federal and state constitutional free-speech protections, but not actual malice, appears to have been a strategic calculation to that end—not an ignorant blunder. Counsel obviously recognized the free-speech implications of this case, and asked for the jury to be instructed *verbatim* on the language of the First Amendment and Article I, Section 9 of the Indiana Constitution, both of which were given without objection. App. 14–15, Tr. 439–40. Reciting those provisions, without discussing the additional protections of the actual malice standard, yields a decidedly broad-brush view of free-speech principles—but his free-speech defense strategy depended on that broad brush. Requesting instructions on actual malice would have called the State's attention to the distinction it repeatedly overlooked between threatening the targets' *reputations* under Indiana Code section 35-45-2-1(c)(6)–(7) and threatening their *safety* under subsections (c)(1)–(3). Defense counsel could reasonably have anticipated that an actual-malice challenge could lead the State either to withdraw (c)(6) and (7) from the instructions, or at least to draw sharper focus onto the statements and conduct that crossed the line and implied a true threat. And because true threats have *no* free-speech protection, Defendant's free-speech defense would then have been all but eviscerated.

By contrast, relying on broad-brush free-speech instructions and a general verdict allowed Defendant to draw attention to his protected opinions without having to justify (or even mention) his threatening statements and course of conduct. Indeed, the theme throughout his closing argument was that his speech was *all* protected political opinion, with no proof that he intended any of it to be threatening:

> Good morning ladies and gentlemen. This is a criminal case. This is not a case about whether you approve[] of Dan Brewington. It's not a case about whether Dan Brewington was a good father. It's not a case about whether he should have had or should not have had joint custody. This is a case about the State of Indiana charging Dan Brewington with four (4) crimes because he expressed opinions. The crux of this case, ladies and gentlemen[,] is not whether you agree with those opinions, even if you like them[. T]he issue is, why did Mr. Brewington express these opinions[?] * * *
>
> This is a great country and it's a great country because we can criticize the government. What the State has done here, ladies and

30

gentlemen . . . , is melt all these things together where Dan Brewington was attempting to be an attorney and attempting to express his frustration, his anger, his upset about a decision in a court that he did not agree with. That's what he was doing in his pleas. . . . It's not unethical for the public to criticize a judge. * * *

[T]he Court will instruct you that . . . the [F]irst [A]mendment to the United States Constitution reads . . . : Congress shall make no law respecting an establishment of religion or prohibiting the free exercise there of [*sic*] or abridging the freedom of speech or of the press or the right of the people to peaceably assemble and to petition the government for a redress of their grievances. Think about what's contained in th[ose] three sentences. How do we look at speech in this country? We look at it in the same way as we look at religion. . . . [Y]ou know the part of this thing, this amendment, is [a] right that people don't talk about but it's probably the most important—is to petition the government for redress. It can be argued[,] ladies and gentlemen . . . [,] that many, many, many, all of Mr. Brewington's blogs were petitions to the government, petitions to the people . . . .* * *

[I]f you want as many people to know it and change opinions hopefully, I guess that's the reason people blog, the[n] you're going to disseminate out in the [I]nternet. This is a case where Mr. Brewington has strong political views and those political views are the family court system stinks. He doesn't agree with them. . . . It is criticism of the government. Appropriate? Nice? No. We're all adults. . . . What did they call the last Republican vice-presidential nominee, Sarah Palin—the things that were said? This is the society that we live in whether we like it or not and criminalizing it is not going to do anything but make us all less free. * * *

[S]ome people would say restricting and not allowing parents to see their children is child abuse. Now is that an unreasonable position? It depends on the circumstances[,] I would guess. Is it a criminal position? I don't think so. And I think if you think about it and . . . separate your distaste for the words you will realize that they haven't proven what his intent was. * * *

This case comes down to Mr. Brewington's intent and whether that intent was to retaliate with regards to Counts I through IV; it's that simple . . . .

Tr. 481–82, 484–85, 488–89, 490–93, 498. By contrast, only once in passing did defense counsel mention how or why Defendant found and published the Judge's home address—and even then, only in the context of perjury, not intimidation. Tr. 499–500. And he never mentioned Defendant's statements about the Doctor's address, neighborhood, mortgage, or Defendant's nearby family

31

members at all. Emphasizing Defendant's protected speech about the family court system while downplaying the threatening aspects of his communications and conduct was objectively reasonable, precisely because so much of Defendant's speech was protected, at least when viewed in a vacuum. But that approach depended on the same constitutional imprecision Defendant now complains of.

Were it not for that apparent strategy, Defendant's arguments would be well taken. As discussed above, the First Amendment and the Indiana Constitution demand a showing of actual malice before the State may impinge on assertions of fact—even false ones—about public figures or issues of public concern; and rhetorically hyperbolic expressions of opinion are always protected, because they can *only* reasonably be understood as assertions of opinion, not of fact. But even constitutional errors may be invited. E.g., United States v. Jernigan, 341 F.3d 1273, 1289 (11th Cir. 2003) ("[P]lain error review is unavailable in cases where a criminal defendant 'invites' the constitutional error of which he complains."). And though it was constitutionally incomplete to instruct the jury on the First Amendment and Article I, Section 9 of our state Constitution without also instructing it on actual malice, glossing over those distinctions was essential to Defendant's defense. His general-verdict and instructional complaints were therefore invited error, not fundamental error. Wilson v. Lindler, 995 F.2d 1256, 1265 & n.7 (4th Cir. 1993) (Widener, J. dissenting) (any "fatal variance" between charging information and jury instructions was invited by counsel's strategy, and not grounds for reversal), opinion adopted by majority in Wilson v. Lindler, 8 F.3d 173 (4th Cir. 1993) (en banc) (per curiam), cert. denied, 510 U.S. 1131 (1994).

### C. Ineffective Assistance of Counsel

For essentially the same reason, we find no ineffective assistance of counsel, either. Showing that counsel's performance was deficient requires proof "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"; and that the deficient performance was "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland v. Washington, 466 U.S. 668, 687 (1984). That determination requires us to make "every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time"—and thus, to "indulge a strong presumption . . . that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). "There are countless ways to provide effective

32

assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." Id.

Even if a decision is hypothetically a reasonable strategic choice, it may nevertheless constitute ineffective assistance if the purported choice is actually "made due to unacceptable ignorance of the law or some other egregious failure rising to the level of deficient attorney performance." Woods v. State, 701 N.E.2d 1208, 1212 (Ind. 1998) (citing Kimmelman v. Morrison, 477 U.S. 365, 383–87 (1986)). But when the challenged tactic is hypothetically reasonable, as it is here for the reasons discussed above, overcoming the presumption of competent representation by showing an actual blunder is Defendant's burden. Id., 701 N.E.2d at 1212 & n.5. That burden, in turn, magnifies the risk of raising an ineffective-assistance claim on direct appeal—because counsel's reasoning may not be "apparent from the trial record," making it "necessary for an additional record to be developed to show the reason for an act or omission that appears in the trial record." Id. at 1212–13. Raising ineffectiveness on direct appeal without the benefit of an additional post-conviction record is permissible, but the issue becomes *res judicata* and therefore unavailable for collateral review. Jewell, 887 N.E.2d at 941–42.

Here, there is no evidence that counsel's approach was borne of ignorance instead of strategy, and the record in fact strongly suggests the contrary. First, as discussed above, counsel's closing argument amounts to an entirely reasonable "all or nothing" strategy to deflect the jury's scrutiny from Defendant's culpable statements and conduct to the large number of otherwise-protected opinions he expressed. Second, Defendant demonstrated significant sophistication about free-speech principles long before trial in a motion to dismiss these charges, Supp. App. 1–4, and confirmed it by his post-verdict, pre-sentencing blog posts, Sent. Ex. 1 at 2–3. Yet he nevertheless agreed under oath (in connection with waiving his right to testify) that even though he and trial counsel "to put it charitably, . . . had a bit of a rocky relationship at times," it was "better now," Tr. 432–33, and he was voluntarily choosing not to testify, Tr. 433–34. His decision not to testify, thus letting the case hinge solely on the sufficiency of the State's proof, was also consistent with an "all or nothing" defense rather than the actual-malice defense he now says he should have had. Since counsel's approach to jury instructions was "within the wide range of reasonable professional assistance" when considered in the abstract, see Strickland, 466 U.S. at 689, and nothing in the record suggests that his approach was actually the product of ignorance, Defendant has not overcome the presumption of competent representation.

Our analysis of that issue does not change merely because counsel's strategy resulted in constitutionally incomplete jury instructions. The reasonableness of a trial strategy is not measured by its doctrinal cogency—even on matters of constitutional law—but by its likelihood of actually obtaining an acquittal for the particular defendant, in the context of the particular case. As this case illustrates, an effective defense may in fact depend on a pragmatic decision to blur constitutional principles. When counsel reasonably believes that *not* giving certain instructions will best-serve a defendant's real-world interests, we should not insist on giving them anyway for the sake of letter-perfect statements of abstract doctrine. We therefore will not grant relief from what by all indications was a deliberate and eminently reasonable strategic choice.

## Conclusion

It is every American's constitutional right to criticize, even ridicule, judges and other participants in the judicial system—and those targets must bear that burden as the price of free public discourse. But that right does not permit threats against the safety and security of any American, even public officials, regardless of whether those threats are accompanied by some protected criticism. Defendant's true threats against the Judge and the Doctor therefore find no refuge in free speech protections. To the contrary, they undermine the core values of judicial neutrality and truthful witness testimony on which every aggrieved citizen depends.

There would be no doubt about that conclusion if Defendant, all in a single episode, had violently shouted and slammed piles of books in the courtroom, shaken his fist at the Judge and the Doctor, and told them, "You crooked child abusers! I'm a pyromaniac, I have guns and know how to use them, I'd like to beat you senseless, I know where you live, and I'm going to hold you accountable!" Under those circumstances, it would be obvious that Defendant was making an unprotected "true threat" against the victims, even if the phrase "crooked child abusers" was protected speech. Defendant's threats neither lose force, nor gain protection, merely because he built them up over the course of a years-long campaign of harassment. In fact, they may be even *more* insidious because they show a persistent, single-minded obsession, not just an isolated outburst or mere venting. To the extent Defendant attempted to veil his threats behind self-serving disclaimers and supposed "hypotheticals," the victims saw through that pretext—as did the jury, and as do we. Accordingly, even though many of Defendant's statements in isolation are protected speech and would make application of Indiana Code section 35-45-2-1(c)(6) and (7) unconstitutional, they form part of the

34

context in which his other statements and conduct become an unprotected "true threat" that may properly be prosecuted under Indiana Code section 35-45-2-1(c)(1)–(3).

And under the circumstances of this case, we find neither fundamental error nor ineffective assistance of counsel in allowing Defendant to be convicted under general verdicts that failed to distinguish between protected "criminal defamation" and unprotected "true threats." Even though that distinction is a matter of constitutional significance, its absence did not deprive Defendant of due process or make a fair trial impossible. To the contrary, it was precisely what enabled his reasonable defense strategy of emphasizing the substantial portion of his statements that the jury would likely recognize as harsh but protected "protest speech," while glossing over his other statements and conduct that had legitimately threatening implications. Our principal concern is not whether that strategy promoted careful constitutional doctrine (which it did not), but rather whether it afforded Defendant a reasonably effective defense to his particular case (which it did).

We therefore grant transfer and affirm Defendant's convictions for intimidating the Judge and obstruction of justice as to the Doctor, finding the evidence sufficient to support those convictions under Indiana Code section 35-45-2-1(c)(1)–(3) without implicating constitutional free-speech protections. As to reversing Defendant's intimidation convictions involving the Doctor and the Judge's wife, and affirming his perjury conviction, we summarily affirm the Court of Appeals.

Dickson, C.J., and Rucker, David, and Massa, JJ., concur.