## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 05 2018, 8:49 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kimberly A. Jackson
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Marjorie Lawyer-Smith
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of S.L., a Child Alleged to be a Delinquent Child,

*Appellant-Respondent,*

v.

State of Indiana,

*Appellee-Petitioner*

September 5, 2018

Court of Appeals Case No.
18A-JV-1017

Appeal from the Lawrence Circuit Court

The Honorable Andrea K. McCord, Judge

Trial Court Cause No.
47C01-1710-JD-463

**Baker, Judge.**

[1] S.L. appeals the juvenile court's order adjudicating her a delinquent child for committing an act that would have been Level 6 Felony Intimidation[1] had it been committed by an adult. She argues that the evidence is insufficient to support the adjudication. S.L. also challenges the juvenile court's decision to place her in the Department of Correction (DOC), contending that it was not the least harsh disposition available. Finding sufficient evidence and no dispositional error, we affirm.

## Facts

[2] On August 24, 2017, sixteen-year-old S.L. and sixteen-year-old J.M. were students attending the same high school. That afternoon, J.M. and S.L. rode the bus home together. S.L. confronted J.M. and told her to stop sending text messages to S.L.'s boyfriend. S.L. told J.M. that she would "cut [her] double chin off," that she would "murder" her, and that she would meet J.M. at her first period class. Tr. Vol. II p. 27-29. S.L. was "very stern" and was not laughing. *Id.*

[3] J.M. later called her mother and was so hysterical that her mother could not understand her. She was very upset, afraid, and angry, and threatened to kill herself. As a result of the incident, J.M. developed anxiety, high blood pressure, and depression. She was afraid to ride the bus after S.L. threatened her, went to the office every day at school to avoid being in class with S.L., and

---

[1] Ind. Code § 35-45-2-1.

frequently vomited and was unable to remain in class. J.M. withdrew from school a few weeks later.

[4] On October 5, 2017, the State filed a petition alleging that S.L. was a delinquent child for committing an act that would have been Level 6 felony intimidation had it been committed by an adult. An evidentiary hearing took place on February 12, 2018; at the close of the hearing, the juvenile court adjudicated S.L. delinquent. On March 29, 2018, the juvenile court conducted a dispositional hearing and committed S.L. to the DOC. S.L. now appeals.

# Discussion and Decision

# I. Sufficiency

[5] S.L. first argues that the evidence is insufficient to support the delinquency adjudication. When the State petitions for a juvenile to be adjudicated delinquent for committing an act that would be a crime if committed by an adult, the State must prove every element of that offense beyond a reasonable doubt. *E.B. v. State*, 89 N.E.3d 1087, 1090 (Ind. Ct. App. 2017). On review of a delinquency adjudication, we neither reweigh the evidence nor assess witness credibility; instead, we will consider only the evidence most favorable to the judgment and the reasonable inferences that may be drawn therefrom. *Id.* We will affirm unless no reasonable factfinder could have found the elements of the offense proved beyond a reasonable doubt. *D.P. v. State*, 80 N.E.3d 913, 915 (Ind. Ct. App. 2017).

[6] To support its delinquency petition in this case, the State was required to prove beyond a reasonable doubt that S.L. communicated a threat to J.M. with the intent to place J.M. in fear of retaliation for a prior lawful act and that the threat was to commit a forcible felony. I.C. § 35-45-2-1.

[7] A "threat" is, among other things, "[a]n expression, by words or action, of an intention to . . . unlawfully injure the person threatened or another person, or damage property." *Id.* Whether a statement is a threat is an objective question for the factfinder. *E.B.*, 89 N.E.3d at 1091. A defendant's intent may be proved by circumstantial evidence alone, and knowledge and intent may be inferred from the facts and circumstances of each case. *Id.* Our Supreme Court has held that whether a statement constitutes a "true threat" depends on two necessary elements: that the speaker intended her communication to place her target in fear for her safety, and that the communication was likely to actually cause such fear in a reasonable person similarly situated to the target. *Brewington v. State*, 7 N.E.3d 946, 963-64 (Ind. 2014) (also explaining that assessing true threats is a highly fact-sensitive inquiry).

[8] Here, S.L. confronted J.M. in an angry, stern manner and told her to stop sending text messages to S.L.'s boyfriend. S.L. threatened to "cut [J.M.'s] double chin off" and said she would "murder" her. Tr. Vol. II p. 27-29. S.L. also told J.M. that she would meet her at her first period class, which J.M. understood to mean that S.L. was going to try to "beat [her] up or something." *Id.*

We find that a reasonable factfinder could conclude that S.L.'s statements to J.M. amounted to a true threat. S.L. described with specificity what she would do to J.M. and when she was going to do it. Taken in context, the evidence established beyond a reasonable doubt that S.L. intended her comments to place J.M. in fear for her safety. We also find that a reasonable factfinder could conclude that a reasonable person similarly situated to J.M. would actually be placed in fear by the comments. We easily accept that an average sixteen-year-old would be frightened by the specific threats made by S.L., particularly when the threats included an explanation of when they would be carried out.

We likewise find that a reasonable factfinder could conclude that S.L.'s threats were made in retaliation for a prior lawful act—the act of J.M. texting with S.L.'s boyfriend. S.L. argues that the threat was intended to stop J.M. from texting him again rather than to retaliate for the prior texts. We find *Roar v. State*, 54 N.E.3d 1001 (Ind. 2016), to be instructive. In that case, our Supreme Court adopted the relevant portion of this Court's opinion. *Roar v. State*, 52 N.E.3d 940 (Ind. Ct. App. 2016), *trans. granted*, *vacated*, *aff'd and adopted in relevant part by id*. In *Roar*, the defendant's sister rented an apartment that was managed by Tracey Olive. One day, Roar saw Olive place an eviction notice on his sister's apartment door. He removed the notice and began yelling at Olive, calling her "a bitch and then told [her] that if [she] came back on the property [] he'd kill [her]." *Id.* at 942. Roar argued that his threat was made with the intent to prevent Olive from returning to the property in the future rather than to place her in fear of retaliation for her prior lawful act of placing

the eviction notice on the apartment door.  This Court disagreed, holding as follows:

> Mere use of conditional language in the course of communicating a threat does not vitiate the statute's application when the factual predicate for the threat was a prior lawful act of the victim.  Stated another way, the language a defendant uses in communicating a threat may be relevant to the fact-finder's assessment of the defendant's intent, but the language used is not the only relevant consideration.

*Id.* at 943.

[11]   Here, S.L. knew who J.M. was and knew that she had been texting S.L.'s boyfriend.  The factfinder was free to conclude, considering this evidence, that S.L.'s threats were in direct response to J.M.'s lawful behavior of texting with S.L.'s boyfriend.  As in *Roar*, S.L. asks us to reweigh the evidence on appeal by giving exclusive weight to the precise language she used when threatening J.M. while simultaneously discrediting all other evidence.  We will not reweigh the evidence on appeal.  We echo the *Roar* Court's conclusion that the juvenile court "was capable of discerning whether intimidation occurred where, as here, there is a clear nexus between the prior lawful act and the threat."  *Id.* at 944.  The evidence plainly demonstrated, first, that S.L. communicated a threat to J.M., and, second, that she did so with the intent to place her in fear of retaliation for a prior lawful act.  Accordingly, we affirm the delinquency adjudication.

# II. Dispositional Order

[12] S.L. next argues that the trial court erred by ordering that she be committed to the DOC. Our Supreme Court has explained that

> [t]he specific disposition of a delinquent is within the juvenile court's discretion, to be guided by the following considerations: the safety of the community, the best interests of the child, the least restrictive alternative, family autonomy and life, freedom of the child, and the freedom and participation of the parent, guardian, or custodian.

*K.S. v. State*, 849 N.E.2d 538, 544 (Ind. 2006); *see also* Ind. Code § 31-37-18-6. We will reverse only if the juvenile court's order is against the logic and effect of the facts and circumstances before it, or the reasonable, probable, and actual deductions that may be drawn therefrom. *K.S.*, 849 N.E.2d at 544. Juvenile courts are accorded wide latitude and great flexibility in their dealings with juveniles. *J.S. v. State*, 881 N.E.2d 26, 28 (Ind. Ct. App. 2008).

[13] S.L. correctly notes that Indiana Code section 31-37-18-6 requires the juvenile court to place the child in the least restrictive setting, but only if that placement is "consistent with the safety of the community and the best interest of the child." In other words, the statute recognizes that in certain situations, the child's best interest—as well as the community's—is better served by a more restrictive placement. *K.A. v. State*, 775 N.E.2d 382, 386-87 (Ind. Ct. App. 2002); *see also D.P. v. State*, 783 N.E.2d 767, 770 (Ind. 2003) (acknowledging that placement with the DOC may still be appropriate even if less restrictive alternatives are available).

[14]     In this case, S.L. has had many chances to reform her behavior with less restrictive alternatives than placement with the DOC.

- In July 2016, S.L. began receiving home-based services after she was reported for habitual disobedience of her parent. Charges were refiled in September 2016 with a preliminary report of being a runaway. She was adjudicated a delinquent in December 2016, ordered to be on supervised probation, and ordered to participate in the juvenile problem-solving court.
- S.L. began participating with the problem-solving court in March 2017. On March 21, 2017, she was sanctioned for violating the participation agreement by associating with a negative peer group, violating curfew, failing to attend school, and failing to attend required treatment and programming.
- In April 2017, S.L. was again sanctioned for failing to complete an assignment for her case plan objectives.
- In May 2017, she was sanctioned for tardiness at school.
- In June 2017, S.L. was again sanctioned for associating with a negative peer group.
- In August 2017, S.L. was arrested for the instant intimidation offense.
- In September 2017, she was sanctioned for failing to report for a drug screen and was moved back to the first phase of the program.
- In October, November, and December 2017, S.L. was repeatedly sanctioned for failure to attend school, poor academic performance, inappropriate behavior, failure to attend required treatment, submitting a positive drug screen, and lying about her substance use.
- Shortly thereafter, S.L. was terminated from the problem-solving court program and from probation.

The problem-solving court is the most intensive program in Lawrence County short of incarceration. As S.L.'s current probation officer and case manager testified, "[t]here is nothing else we have that's more than what we already did with her." Tr. Vol. II p. 73. S.L.'s current and previous probation officers

recommended placement with the DOC because there were no other services available that she had not already tried and failed.[2]

[15] S.L. notes that there was evidence tending to show that she had made positive strides in the weeks leading up to the dispositional hearing. Indeed, there was testimony that she was working toward her GED, was more helpful at home, and was behaving in a more controlled and mature manner. This amounts, however, to a request that we reweigh the evidence, which we may not do. The evidence establishes that S.L. has been afforded many opportunities to reform her behavior and that she has failed to take advantage of those opportunities. Indeed, she even committed the instant offense while still participating with the problem-solving court for her previous one. There were simply no viable options left aside from commitment to the DOC. Therefore, we find that the juvenile court did not err by ordering that S.L. be committed to the DOC.

[16] The judgment of the juvenile court is affirmed.

May, J., and Robb, J., concur.

---

[2] There was also evidence that S.L. was part of a Child in Need of Services case and that her mother was also repeatedly sanctioned for failing to abide by the problem-solving court agreement for failing to properly supervise S.L. Based on these facts, S.L.'s probation officer concluded that S.L. was at a high risk to reoffend if left in the care of her mother.