## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 02 2019, 9:52 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Karen Celestino-Horseman
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Caryn N. Szyper
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Ben J. Kendrick,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff.*

April 2, 2019

Court of Appeals Case No.
18A-CR-967

Appeal from the Marion Superior Court

The Honorable Mark D. Stoner, Judge

The Honorable Jeffrey Marchal, Magistrate

Trial Court Cause No.
49G06-1701-F1-1024

**Darden, Senior Judge.**

## Statement of the Case

Ben Kendrick appeals his conviction of three counts of Level 1 felony child molesting.[1]  We affirm.

## Issue

The sole issue Kendrick raises for review is whether the trial court abused its discretion by admitting into evidence a medical doctor's testimony regarding a diagnosis of the victim.

## Facts and Procedural History

Eight-year-old J.O. lived in a house in Marion County with her mother, D.W., her two sisters, and D.W.'s twenty-nine-year-old boyfriend, Kendrick.  Kendrick, who was married at the time, had been dating D.W. "on and off for about three or four years" and was the father of one of J.O.'s sisters.  Tr. Vol. II, p. 64.  In December 2015, D.W. had a slip-and-fall accident that required her to be on bedrest for approximately six months.  During that six-month period, Kendrick became the primary caregiver for J.O. and her two sisters.

One day, when J.O. was in the third grade, Kendrick picked J.O. up from school, drove her to a dollar store, and parked his truck in the "back" section of the parking lot.  *Id.* at 107.  He unzipped his pants, pulled out his erect penis, and told J.O. to "suck it" "like a lollipop."  *Id.* at 109, 123.  J.O. did as she was

---

[1] Ind. Code § 35-42-4-3(a)(1) (2015).

told. She moved her mouth "[u]p and down" around Kendrick's penis while Kendrick had his hands on her buttocks. *Id.* at 110. J.O. could not recall how long it lasted, but she testified that she stopped when Kendrick "peed in [her] mouth." *Id.* Kendrick then told her to "spit it out on a rag" he had pulled from behind the driver's seat. *Id.* J.O. recalled that the "pee" tasted "[n]asty." *Id.* at 111. Kendrick then told J.O., "Don't tell anyone. This is my little secret." *Id.* at 112. J.O. testified that the molesting occurred more than once in the parking lot.

[5]     On another occasion, J.O. was in her mother's bedroom when Kendrick, who was naked, stood at the foot of the bed and had J.O. lie on her stomach on the bed. Kendrick then inserted his penis into J.O.'s mouth and moved his penis back and forth. J.O. also testified that, on another occasion, Kendrick used his cell phone to record J.O. while she was "[s]ucking his front private part." *Id.* at 119.

[6]     In April of 2016, the house became infested with vermin, so the family moved into Kendrick's mother's apartment. J.O. testified that, one day, when Kendrick was babysitting J.O. at the apartment, she and Kendrick were in the playroom when Kendrick knelt behind her and inserted his penis in her bottom. J.O. recalled that when she told Kendrick that it hurt, he responded, "Just a couple more minutes." *Id.* at 123.

[7]     Kendrick and D.W. ended their relationship in October 2016.

[8] On November 16, 2016, J.O. spent the night with her thirteen-year-old aunt.[2] Late that night, J.O. told her aunt what Kendrick had done to her. J.O.'s aunt then reported the information to her mother, Q.W., who immediately asked J.O. to repeat the information to her. J.O. was "nervous," "scared," and "crying" when she recounted what had happened. *Id.* at 46, 55. Q.W. then told her husband, E.W., what had happened, and E.W. immediately called J.O.'s mother, D.W., and relayed the information to her. The next day, November 17, 2016, D.W. took J.O. to a local hospital for an examination.

[9] After an investigation, the State charged Kendrick, on January 9, 2017, with four counts of child molesting as Level 1 felonies and one count of child molesting as a Level 4 felony. Kendrick's two-day jury trial was held on February 28 and March 1, 2018.

[10] During trial, Dr. Catherine Huber ("Dr. Huber"), a pediatrician for the Pediatric Center for Hope, located at Riley Hospital for Children, testified for the State. The center is an out-patient clinic where children are evaluated when there are concerns regarding sexual abuse. Dr. Huber first told the jury that, on December 5, 2016, D.W. brought J.O. to the clinic. Dr. Huber then explained, in general terms, the protocol that she follows when a child presents at the clinic for alleged sexual abuse. She explained that she begins by obtaining background information from the child's caregiver, including medical history

---

[2] D.W. and J.O.'s aunt are half-sisters.

and information about "what the concerns were that brought the child to the appointment." *Id.* at 183. She then conducts a general physical examination of the child. Regarding J.O.'s examination, Dr. Huber found that "[J.O.'s] exam was normal" – "no scarring, no injuries." *Id.* at 188, 190. However, Dr. Huber clarified that, in sexual abuse cases,

> [o]nly five to six percent of the time will there actually be an injury found. A lot of the times this is because there was no injury that occurred at all at the time of the evaluation. The tissues are very stretchy and flexible[,] and they are also very quickly [sic] to heal. So even if there was an injury at the time of an event, depending on when the examination occurs, it might have healed completely and there is no evidence of that injury anymore.

*Id.* at 189. When asked by the prosecutor whether "sexual abuse is an actual medical diagnosis that you can provide if you find it to be diagnostically appropriate," Dr. Huber replied, "Yes." *Id.* at 189-90.

[11] On cross-examination, defense counsel questioned Dr. Huber about whether there were scientific studies to support the percentages she cited regarding physical injuries in sexual abuse cases. Counsel then asked Dr. Huber if she knew "when the last alleged sexual conduct" occurred between J.O. and Kendrick. *Id.* at 194. Dr. Huber responded that the "last possible contact was in October [2016]." *Id.* Counsel then asked Dr. Huber which individual provided her with this information. Dr. Huber replied, "The mother." *Id.*

[12] At the conclusion of Dr. Huber's testimony, the jury submitted two questions for the witness, one of which is relevant to the instant case. Defense counsel stated that he had "[n]o objection" to the juror question. *Id.* at 195. The trial court then posed the question to Dr. Huber, which was: "Did you diagnose [J.O.] with sexual abuse?" *Id.* Dr. Huber responded, "Yes. The diagnosis of child sexual abuse was made at the time of her appointment." *Id.*

[13] After Dr. Huber answered the second, unrelated juror question, defense counsel engaged in follow-up questioning:

> [DEFENSE COUNSEL:] Dr. Huber, the basis of the sexual abuse diagnosis, that was only based on the statements by the mother then, correct?
>
> [DR. HUBER:] The majority of the information that I had at the time of the appointment did come from the mother. Yes. And then I was provided information at a later date regarding the child's forensic interview.
>
> [DEFENSE COUNSEL:] Okay. So[,] it's only based on that information. It is not based on any physical evidence that you found?
>
> [DR. HUBER:] It is not based on physical evidence. No.

*Id.* at 196. Later, during closing argument, defense counsel revisited the sexual abuse diagnosis, stating:

> We also heard how there was no physical evidence. No physical injury of any kind that was recovered by the doctors. We also

heard the doctor say that they assessed sexual abuse. But remember it was only based on her words, her mom's words and hers. It was not based on any other evidence. Also remember that a doctor does not have the burden of beyond a reasonable doubt. A doctor is only going based on two people's words without full picture, without all the information you have, without all the knowledge you have. After all, would you want a doctor to diagnose you only based on your statement? I know I wouldn't. And it's definitely no[t] how our criminal justice system works.

Tr. Vol. III, p. 131.

[14] The jury found Kendrick guilty of three counts of Level 1 felony child molesting and the single count of Level 4 felony child molesting. The trial court declined to enter judgment of conviction on the Level 4 felony based upon double jeopardy concerns. On March 22, 2018, Kendrick was sentenced to twenty-two years for each of the remaining convictions, to be served concurrently.

[15] Kendrick appeals.

# Discussion and Decision

[16] The issue is whether the trial court abused its discretion in allowing Dr. Huber to testify that she diagnosed J.O. as suffering from sexual abuse when, according to Kendrick, the "diagnosis was premised upon statements made by J.O. to her mother and shared with the doctor by the mother." Appellant's Br. p. 6. Kendrick contends that "Dr. Huber's diagnosis of J.O. as suffering from sexual abuse was the equivalent of Dr. Huber vouching for J.O.'s truthfulness." *Id*. at 8.

[17] A trial court has broad discretion in ruling on the admissibility of evidence, and we will disturb its rulings only where it is shown that the court abused that discretion. *Hoglund v. State*, 962 N.E.2d 1230, 1237 (Ind. 2012). An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before it. *Id.*

[18] Vouching testimony is specifically prohibited under Indiana Evidence Rule 704(b), which states: "Witnesses may not testify to opinions concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness has testified truthfully; or legal conclusions." This testimony is considered an "invasion of the province of the jury in determining what weight they would place upon the child's testimony." *Head v. State*, 519 N.E.2d 151, 153 (Ind. 1988).

[19] However, before we determine whether the testimony in question amounted to vouching, and, ultimately, whether the trial court abused its discretion in admitting the testimony into evidence, "[a]s a preliminary inquiry, [we] must first determine whether the appellant properly preserved the alleged error at the trial level." *Durden v. State*, 99 N.E.3d 645, 651 (Ind. 2018). We find that Kendrick did not.

[20] The record clearly indicates that Kendrick did not preserve his claim of error by raising proper objections at trial. In fact, as to the juror's question for Dr. Huber regarding whether she had diagnosed J.O. with sexual abuse, Kendrick stated that he had "[n]o objection." Tr. Vol. II, p. 195.

Kendrick seeks to avoid this procedural default by establishing that fundamental error occurred. "Fundamental error is an extremely narrow exception to the waiver rule where the defendant faces the heavy burden of showing that the alleged errors are so prejudicial to the defendant's rights as to make a fair trial impossible." *Ryan v. State*, 9 N.E.3d 663, 668 (Ind. 2014) (quotation and citations omitted). The State counters that Kendrick invited any error, and that the fundamental error exception is therefore inapplicable. We agree.

> [T]he doctrine of invited error is grounded in estoppel[] and forbids a party to take advantage of an error that he commits, invites, or which is the natural consequence of his own neglect or misconduct. At bottom, then, fundamental error gives us leeway to mitigate the consequences of counsel's oversights, but invited error precludes relief from counsel's strategic decisions gone awry.

*Brewington v. State*, 7 N.E.3d 946, 975 (Ind. 2014) (internal citations, quotations, and brackets omitted). Simply put, invited error "is not reversible error" and is "not subject to appellate review." *Kingery v. State*, 659 N.E.2d 490, 494 (Ind. 1995).

Kendrick invited the error he now challenges as fundamental error. Kendrick did not object to the prosecutor's question regarding whether sexual abuse is an actual diagnosis that can be made. Kendrick also did not object to the juror's question posed to Dr. Huber regarding whether J.O. had been diagnosed with suffering from sexual abuse, instead explicitly stating that he had no objection

to the question. During follow-up questioning of Dr. Huber, Kendrick's counsel chose to revisit the matter when he sought to clarify that Dr. Huber's diagnosis was based upon information received from D.W. and not upon any physical evidence. In his closing argument, counsel, in an apparent attempt to discredit Dr. Huber, reiterated to the jury that J.O. suffered no physical injuries and that Dr. Huber's sexual abuse diagnosis was not rooted in science but instead was based upon what D.W. told Dr. Huber regarding J.O.'s allegations.

[24] Having failed to object to the questions and answers regarding the sexual abuse diagnosis, Kendrick waived the error. He then invited error by indicating that he had "[n]o objection" to a direct question from a juror regarding the sexual abuse diagnosis, eliciting additional testimony from Dr. Huber regarding the diagnosis, and including comments about Dr. Huber's testimony in his closing arguments. Tr. Vol. II, p. 195. As such, Kendrick cannot obtain reversal on this basis.

[25] Waiver and invited error notwithstanding, we disagree with Kendrick's claim that Dr. Huber's testimony violated the prohibition against vouching. Dr. Huber's testimony cited research statistics regarding the percentage of children who have been victims of sexual abuse that exhibit physical injuries. When asked by the prosecutor if sexual abuse is an actual medical diagnosis that can be found if appropriate, Dr. Huber answered in the affirmative. She also answered in the affirmative as to the juror's question regarding whether she "diagnose[d] J.O. with sexual abuse." *Id.* The doctor did not elaborate.

During follow-up questioning by defense counsel, Dr. Huber explained that the diagnosis was based upon D.W.'s statements and not upon physical evidence.

Dr. Huber did not specifically state that she believed J.O.'s allegations. Dr. Huber's testimony did not speak to J.O.'s credibility and was not an opinion regarding the truth of J.O.'s allegations against Kendrick. Dr. Huber expressed no opinion "concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness has testified truthfully; or legal conclusion." Ind. Evid. R. 704(b). The doctor's responses regarding the diagnosis of sexual abuse did not invade the jury's province to determine J.O.'s credibility. As such, Dr. Huber's testimony was not vouching testimony prohibited by Indiana Evidence Rule 704(b), and the trial court did not abuse its discretion by admitting the testimony into evidence.

## Conclusion

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

Pyle, J., concur.

Vaidik, C.J., concur in result without opinion.