

I N T H E

# Court of Appeals of Indiana

Craig R. Hendry,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*



FILED

Nov 12 2025, 8:51 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

---

November 12, 2025

Court of Appeals Case No.
25A-CR-22

Appeal from the Vermillion Circuit Court

The Honorable Hunter J. Reece, Special Judge

Trial Court Cause No.
83C01-2310-F6-111

---

**Opinion by Judge Weissmann**
Judges Bailey and Brown concur.

**Weissmann, Judge.**

[1] Craig Hendry became a frequent visitor to city hall in the small town of Clinton, where he filmed confrontational interactions with employees and posted the videos to his YouTube channel. After he uploaded his first video from Clinton and listed the phone number of the mayor's office in the video's caption, city hall received hundreds of threatening phone calls and voicemails.

[2] Hendry continued to visit city hall and targeted the mayor's assistant, P.K., banging on her closed office door and filming her through her closed blinds. After he was prohibited from entering city hall, he waited in the parking lot and followed P.K. to her car. Based on this conduct, Hendry was convicted of Level 6 felony stalking and Class B misdemeanor aiding, inducing, or causing harassment. He appeals, challenging the sufficiency of the evidence supporting his convictions and claiming that his conduct was constitutionally protected free speech. We affirm.

## Facts

[3] Hendry makes his living by posting videos on YouTube in which he, in his own words, "go[es] around and record[s] government buildings" to observe whether employees "uphold [the] constitutional right to freedom of speech in public." Tr. Vol. IV, pp. 121, 123. Some of his interactions with government personnel turn argumentative and hostile. He posts videos of these interactions to his YouTube channels, which have over 65,000 subscribers. Hendry earns income based on video views, donations, and the sale of merchandise.

[4] Over the course of about 18 months in 2022 and 2023, Hendry visited Clinton City Hall multiple times and filmed confrontational interactions with employees. He posted videos of these visits on YouTube with thumbnails containing messages such as "COP GONE WILD," "THIS PIG WILL VIOLATE," and "THROW HIM OUT." State's Exhs. 7, 19, 20. The captions of his videos included the contact information for Clinton's city hall, which received hundreds of threatening phone calls in response.

[5] Hendry made his first visit to Clinton on April 19, 2022, when city hall was still closed to the public due to COVID-19. When he and his filming partner first walked into the building, Clinton Chief of Police Billy MacLaren asked the two: "Can I help you?" State's Exh. 1 at 1:16. Hendry responded: "No, I definitely don't need your help, brother." *Id.* at 1:18-20. Chief MacLaren explained that city hall was closed to the public and asked Hendry and his partner to leave. They refused, and an argument ensued. Chief MacLaren repeated his request roughly 24 times, but Hendry insisted he was not required to leave. Hendry stated: "Dude, I'm telling you, you can tell me, 'Please leave, please leave.' But it's not a law. I don't obey." *Id.* at 8:59-9:03.

[6] As the argument grew more heated and protracted, another officer arrived. Then, Clinton Mayor Jack Gilfoy came out of his nearby office to provide documentation showing that city hall was closed. Mayor Gilfoy's assistant, P.K., also emerged from the office she shared with the mayor and attempted to record the interaction on her cell phone. Hendry and his partner still refused to leave. Chief MacLaren gradually moved them towards the exit, backing Hendry

and his partner out of city hall. By this point, it had been over ten minutes since Chief MacLaren first told them to leave.

[7] As Hendry exited the building, he yelled at Chief MacLaren: "If you wanna take that badge off, we can figure out who's the tough guy." *Id.* at 11:24-27. P.K., who was just behind Chief MacLaren, heard this statement and exclaimed: "Oh, that was a threat." *Id.* at 11:27-29. Hendry continued: "You're a p***y bro. Come on, take the badge off and let's go somewhere else. Let's go to private property and you can fight." *Id.* at 11:30-36. Chief MacLaren shut the door as Hendry shouted: "P***y a** pig. I swear to god, bro. This is why cops drop. You hear me?" *Id.* at 11:43-49. Hendry, now outside city hall, filmed P.K. through the glass door. P.K. was filming Hendry on her cell phone, and Hendry yelled: "I'm getting that recording there. I'm going to, it's called public records request. You think you're so tough." *Id.* at 11:55-12:01.

[8] Hendry then walked next door to the police station to file a complaint against Chief MacLaren. Once inside, he remarked: "The way that guy acts I wouldn't be surprised if he ended up like Greg Ferency." *Id.* at 13:12-15. As later explained at Hendry's trial, Greg Ferency was a police officer in nearby Terre Haute who was shot and killed while off duty. When Chief MacLaren greeted Hendry at the police department desk, Hendry asked for public records from city hall but refused to specify which records. Hendry threatened: "If you take longer than five minutes to get it, man, I'm gonna go in there and do it myself." *Id.* at 14:42-47. As Chief MacLaren left the desk, Hendry yelled after him: "Hey

thug, get over here. Hey, you piece of [muted in video] why don't you go on and get over here. Here piggy, piggy, piggy, piggy, piggy." *Id.* at 15:30-43.

[9] Hendry then left the police station and called P.K. in the mayor's office to request the video recording she had made on her cell phone, but she hung up on him. Hendry then "continuously call[ed] for the next 15 minutes" and eventually left a voicemail threatening to sue if he did not receive the records he was requesting. *Id.* at 17:14-17.

[10] A few days after his April 19 confrontations, Hendry posted the video of his visit on YouTube. The video's caption included the phone numbers for both Clinton's police department and the mayor's office. The posting of this video triggered an immediate and massive harassment campaign against the city offices. On the day Hendry posted the video, the mayor's office received 195 phone calls—far exceeding the normal daily volume of roughly 5 calls. In the first week following the video's posting, the office received 529 phone calls and hundreds of voicemails, most referencing Hendry's video. Over the course of April 2022, the mayor's office received over 770 phone calls.

[11] P.K. listened to all the voicemails that came into her office to determine whether anyone had legitimate business with city hall. She found only three legitimate calls of the 423 voicemails she documented through May 18, 2022. She identified about 350 messages as containing personal threats to P.K. and the other employees that appeared in Hendry's videos. In one message, the caller threatened: "We're coming up there next week and we're gonna have five

guys go to your f*****g city hall with baseball bats. . . . They're going to get their f*****g head smashed in." State's Exh. 11-1 at 0:05-16.[1] Another message referenced the mayor and P.K., stating: "You should die motherf****r. Somebody should shot (sic) you in the head as soon as possible, you piece of s**t, you and that b***h, that old witch. Even the chief, somebody should shot (sic) you in the f*****g head." State's Exh. 11-7 at 0:17-37. Another message threatened: "You better watch your back, you piece of s**t. People are out to get you. This is the new world. Look out, b***h." State's Exh. 11-8 at 0:01-09.

[12] Over the next year, the calls eventually died down, and Hendry had no in-person contact with Clinton City Hall. Then, in April 2023, Hendry reposted the same video he had filmed a year prior—his April 2022 confrontations with Chief MacLaren, Mayor Gilfoy, and P.K.—and again, the threatening phone calls spiked, exceeding 500 total in the first month.

[13] Hendry then began attending Clinton City Council meetings around July of 2023. At this time, Clinton was experiencing a hotly contested mayoral race between incumbent Mayor Gilfoy and challenger Bart Mooney. When Hendry returned to Clinton, he moved in with Mooney.

[14] Around this same time, Hendry began visiting city hall approximately once a week, with a special focus on the mayor's office and P.K. Over the next few

---

[1] The State's Exhibit 11 was split into 32 subparts, each subpart a recording of a single voicemail message. Our notation of "11-1" indicates Exhibit 11, subpart 1.

months, he came to P.K.'s office multiple times, filming most but not all of their interactions. His stated purposes varied. He sometimes questioned P.K. about her work in the mayor's office, referencing some record he had found showing her employment was listed under the city's water department, rather than the mayor's office. Other times, Hendry would call out to P.K. by name and ask her to come outside and speak with him without further explanation.

[15] Though some of Hendry's early interactions with P.K. were brief, they soon escalated. Once, Hendry came in and asked to see Mayor Gilfoy, who was out of the office. P.K. took Hendry's phone number, and Hendry left. But often, Hendry lingered outside P.K.'s office and in the lobby of city hall, filming P.K.'s door or other people working. He would return to her closed door multiple times, knock repeatedly, and film her through the gaps in her closed blinds. After Hendry's first few visits, P.K. began locking her office door "all the time" and "taped the blinds shut." Tr. Vol. IV, p. 39. P.K. also asked security to install a feed of the building's security cameras on her computer. Still, Hendry continued coming to P.K.'s door. P.K. described him as "beating on [her] door [and] jangling [the] door knob." *Id.*

[16] On September 13, 2023, Hendry entered city hall with his camera. It appeared that for some, if not all, of this visit, he was broadcasting a live stream on

YouTube.[2] Hendry walked directly to the mayor's office and knocked repeatedly. P.K. responded, "Can I help you?" through the door. State's Exh. 18 at 7:49-50. When P.K. refused to open the door despite Hendry's multiple requests, Hendry said: "This is very disruptive, you're making me speak loudly in the city hall, you see how that's a problem?" *Id.* at 8:23-29. P.K. did not respond, and Hendry continued waiting just outside the office door. He spoke loudly to his camera about rumors that P.K. and the mayor were having a "fling" and that the office's locked door and shut blinds were "suspicious behavior." *Id.* at 9:17-27. He knocked again repeatedly, but P.K. still did not answer the door.

[17]     Hendry eventually walked back into the lobby of city hall and noticed an employee of the water office on the phone with police. He then saw the city clerk and asked him if he had called the police, to which the clerk responded, "I don't want you bothering [P.K.]," and "She doesn't want to get involved in this." State's Exh. 2 at 2:18-2:33. Hendry and the clerk were then joined by Officer Andrew Finley, who had been called to "remove Mr. Hendry from in front of the mayor's office." Tr. Vol. III, p. 148.

[18]     Hendry explained to Officer Finley that he wanted to "inspect the records" of the city. State's Exh. 2 at 2:53-54. Hendry then attempted to walk down the

---

[2] At trial, Hendry stated about that day: "I believe I was actually live." Tr. Vol. IV, p. 186. And in both the raw footage from that day and the final video that Hendry later posted, he spoke to the camera as though an audience was watching and told Officer Finley that he was on his livestreaming video.

hallway to the clerk's office and mayor's office, but Officer Finley blocked his path. When Hendry clarified that he wanted to see the city employee salaries, Officer Finley explained that such information was readily available online. Hendry responded, "No, absolutely not," and insisted that the clerk's office provide him the records. *Id.* at 4:23-25.

[19] After a lengthy back and forth about the specifics of the public records statute, Hendry filled out a request form. Officer Finley took the completed form into the clerk's office for processing, closing the door behind him. The door was marked with a sign reading "NOTICE: EMPLOYEES ONLY BEYOND THIS POINT," but Hendry nonetheless opened that door and began to walk through. *Id.* at 7:07. Officer Finley stopped him and redirected him to the public lobby. There, Hendry walked up to the help-desk window of the water office. He filmed an employee in the water office, calling her "all red-faced and ugly looking." State's Exh. 2 at 8:22-25. He continued milling around the lobby as he spoke to his live stream, stating that the city hall employees were "clearly conspiring to kidnap me right now." *Id.* at 8:48-52. He also talked about P.K. and called her the mayor's "little play toy." *Id.* at 12:09.

[20] Officer Finley eventually asked Hendry if he had any more business to conduct at city hall, and Hendry responded: "I don't really feel like I want to tell you. You want to threaten me to tell you?" *Id.* at 14:36-40. He continued: "But I'm about to tell my YouTube subscribers, you can go and watch the livestream if you want." *Id.* at 14:44-50. Officer Finley responded: "I'm literally live on the

livestream, what do I got to watch it for?" *Id.* at 14:50-54. Hendry added: "I just don't answer questions, that's a principle thing." *Id.* at 14:56-59.

[21] As he continued to walk around the lobby, Hendry explained to his livestream viewers that he was at city hall because of reports that there were "some extremely sour individuals here who are willing to go to very, very far lengths." *Id.* at 17:06-14. He later added: "What we're here to report to you is how they treat people they don't like in this city. So for example, with me, they've called this guy," referring to Officer Finley. *Id.* at 17:35-43. Soon after, Hendry left. On his way out, he filmed an employee on the phone and stated: "That line will stay busy, guys, just so you know, they don't answer calls around here." *Id.* at 18:44-48.

[22] The day after his September 13 confrontations, Hendry uploaded a video of them to his YouTube channel. In this posted video, he edited out the portion of the footage in which he accused P.K. of having a fling with the mayor but kept in his comment about P.K. being the mayor's "little play toy." *Id.* at 12:09. The video's caption included the message: "To complain, and To ask why [P.K.] isnt (sic) working in the water office[:] Clinton Mayors (sic) Office: 765-832-7477." State's Exh. 19.

[23] Following Hendry's livestream and upload, calls to the city again spiked. The mayor's office received 51 calls on September 13 (the day of the live stream), 48 calls on September 14 (the day the video was posted), and a total of 377 in the month of September. This call volume far exceeded the typical 5 or 6 calls

received per day. After he posted the video, Hendry personally called P.K. and asked "if [she] was receiving a lot of phone calls as to why people weren't allowed in the Clerk's Office." Tr. Vol. IV, p. 77.

[24] Many of the callers again left threatening voicemails. This time, the messages also targeted M.F., an employee of the city's water office who had interacted with Hendry multiple times. M.F. reported that her office had received "hundreds upon hundreds of phone calls" following Hendry's videos. Tr. Vol. III, p. 187. One caller told M.F. he "hope[d] that [her] children get raped and murdered in the street in front of [her]." State's Exh. 23.

[25] On September 19, 2023, Hendry returned to city hall to ask about P.K., but she was not there. Hendry then engaged with two workers in the city's water office, including M.F. Hendry asked M.F. about P.K. and accused the other employee of being under the influence of drugs. After Hendry left that day, M.F. wrote a report about Hendry's actions, the phone calls she received as a result, and the fear and distress it caused her both at work and at home. The next day, Hendry was delivered a letter informing him that he was prohibited from entering city hall for 90 days, except to attend city council meetings.

[26] A few days later, on September 22, 2023, Hendry and a different companion went back to city hall, arriving in a red truck. The companion went into city hall, and Hendry waited outside in the parking lot, setting up his camera on a tripod. P.K. saw them arrive on her security cameras and was so scared that she asked police officers to escort her to her car at the end of the workday. When

P.K. exited the building with the officers, Hendry said: "There she is." Def.'s Exh. C at 6:58. He then continued filming as he followed P.K. to her car and called after her. When a police officer told Hendry to stop talking to P.K., Hendry yelled: "I don't care what you said, shut up." State's Exh. 3 at 0:10-12. Hendry later uploaded a video of this interaction to his YouTube channel.

[27] P.K. was too afraid to drive straight home that day, so she drove to a local business a few minutes away from city hall. She then saw a red truck drive by and believed it to be the same red truck in which Hendry had arrived at city hall earlier that day. A couple weeks later, P.K. again saw Hendry in the parking lot of city hall, "hiding around the corner" and "waiting for [her] to come out." Tr. Vol. IV, p. 98.

[28] In October 2023, Hendry was charged with multiple felonies and misdemeanors relating to his videos and conduct at Clinton's city hall.[3] While his charges were pending, Hendry's videos continued to generate harassing phone calls to city hall. In July 2024, a caller left a threatening message about P.K., stating: "[T]hat dumb f*****g city worker with the purple iPhone. She thinks she's safe. . . . That makes me want to kill her. That makes me want to tie her to a chair and torture her and listen to her beg for her life. . . . I'll tell you what, she's not

---

[3] Hendry was initially charged with Level 6 felony stalking of P.K., Level 6 felony stalking of M.F., and Class B misdemeanor harassment of P.K. Soon after, the State dismissed the latter two charges. And a few months after that, the State filed two counts of Class B misdemeanor aiding, inducing, or causing harassment: one pertaining to Clinton city employees and the other to P.K.

safe when she's not at work, when she's not around those dumb f*****g pigs who will protect her." State's Exh. 13 at 2:03-3:13.

[29] Hendry eventually went to trial on three charges: (1) Level 6 felony stalking of P.K.; (2) Class B misdemeanor aiding, inducing, or causing harassment of Clinton city employees; and (3) Class B misdemeanor aiding, inducing, or causing harassment of P.K. During Hendry's three-day jury trial, P.K. and M.F. testified as to their interactions with Hendry and the ongoing fear they felt due to his conduct, his videos, and the threatening messages they received as a result. P.K. explained that she no longer walked to work on her own, was scared to take her grandchildren out in public, sought therapy, and began taking medication for anxiety and depression. M.F. explained that she too had begun taking medication for anxiety and was terrified to leave her house. An Indiana State Police investigator testified as to the pattern of calls received by the mayor's office following Hendry's video posts.

[30] Hendry testified in his defense, characterizing his actions as merely conducting "investigation[s]" into government conduct and stating that "it's [his] freedom of speech to call people names." Tr. Vol. IV, p. 135, 170. He explained that he included the mayor's phone number in the captions of his videos because "people actually asked me for the information so that they could call." *Id.* at 166. He added that when he uploads videos without including the contact information for a public official, viewers request the information from him. As a result, he includes it in the caption upon upload because that is "easier" than responding to each request. *Id.* at 127. Hendry explained that most of these

viewers are "First Amendment enthusiasts" who "like to express their grievances via telephone" and email. *Id.* at 127-28.

[31] The jury returned guilty verdicts on all three charges. The trial court convicted Hendry accordingly but vacated his conviction for misdemeanor aiding, inducing, or causing harassment of P.K. due to double jeopardy concerns. The court later sentenced Hendry to concurrent sentences of 548 days on the stalking count and 180 days on the harassment count.

## Discussion and Decision

[32] Hendry appeals both of his convictions, challenging the sufficiency of the evidence supporting them. When reviewing such claims, we do not reweigh evidence but consider only the probative evidence and the reasonable inferences supporting the verdict. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). We affirm unless no reasonable factfinder could conclude the elements of the crime were proven beyond a reasonable doubt. *Id.* The evidence need not "overcome every reasonable hypothesis of innocence." *Id.* at 147 (citation omitted).

[33] Though Hendry's appellate arguments are not clearly delineated between his two convictions, we address each conviction separately and affirm.

## I.    Stalking of P.K.

[34] Hendry was convicted of Level 6 felony stalking under Indiana Code § 35-45-10-1, which required the State prove that he knowingly or intentionally engaged in a "course of conduct involving repeated or continuing harassment" of P.K.

that would cause a reasonable person, and did actually cause P.K., to "feel terrorized, frightened, intimidated, or threatened." Ind. Code § 35-45-10-1. Harassment, as defined in the stalking chapter, means conduct that includes repeated or continuous "impermissible contacts" which reasonably cause the victim emotional distress but does not include constitutionally protected activity. Ind. Code § 35-45-10-2.

[35] Hendry, however, cites a different definition of "harassment," which leads the rest of his argument astray. He repeatedly relies on the definition of harassment under Indiana Code § 35-45-2-2(a)(1), which is a different, narrower kind of harassment prohibiting the placement of telephone calls intended to "harass, annoy, or alarm" without the intent of legitimate communication. This is the type of harassment alleged in his *other* conviction—aiding, inducing, or causing harassment of city employees—but does not apply to his stalking conviction.

[36] Using this narrower definition, Hendry asserts that the factual basis for stalking is limited only to the phone calls placed to city hall and then premises the remainder of his argument on this mistaken notion.[4] Because of this

---

[4] For instance, Hendry states: "The State attempts to prove stalking of [P.K.] with evidence that individuals unknown to either [Hendry] or anyone in City Hall called to complain regarding the conduct depicted in [Hendry's] video." Appellant's Br., p. 14. Although Hendry at one point cites the proper definition of "harassment" under the stalking chapter, he still asserts that the conduct underlying the stalking conviction was limited to the phone calls. Hendry does not explain why he makes such an assumption, considering the charging information clearly sets out two distinct offenses, and the State's opening and closing statements reference Hendry's impermissible contacts with P.K. as the basis for the stalking conviction.

misunderstanding, Hendry ultimately fails to address the actual conduct underlying his stalking conviction—his "impermissible contacts" with P.K.

[37] The record shows that Hendry not only visited P.K.'s office on numerous occasions but also camped outside her door after she refused to answer his knocks. He also "bang[ed]" on P.K.'s door and "jangl[ed]" the doorknob, filmed P.K. through her closed blinds, and loudly accused her of having a sexual relationship with the mayor while just outside her door. Tr. Vol. IV, p. 39. After Hendry was banned from city hall, he twice waited outside in the parking lot. On one of those occasions, he followed P.K. to her car as she was being escorted by police, yelled at police when they tried to stop him, and then posted a video of that interaction on YouTube. Hendry also featured P.K. in numerous other videos, using an image of her face as a video thumbnail, making accusations about her, and calling her the mayor's "little play toy." State's Exh. 2 at 12:09.

[38] Hendry does not discuss these specific instances. He makes only the general assertions, without further analysis, that P.K. was "never targeted by Hendry" and that his contacts were "appropriate in context" and "tangential" to his attempts to speak to the mayor. Appellants Br., p. 12; Appellant's Reply Br., pp. 5-6. These claims are contrary to the evidence showing that Hendry often sought out P.K. specifically, without reference to the mayor. He requested to speak with her by name and asked other employees questions about her. He also remarked, "There she is," when P.K. emerged from city hall the day he

waited in the parking lot, suggesting that he was waiting specifically for P.K. Def.'s Exh. C at 6:58.

[39] Without further explanation from Hendry, we fail to see how conduct like filming P.K. through her blinds, banging on her door, and suggesting she had an improper relationship with the mayor was appropriate in the context of his activities at city hall. Therefore, we find the evidence supports the conclusion that Hendry harassed P.K. for the purposes of his stalking conviction.

[40] The record also supports the other elements of stalking. As to P.K.'s actual fear as a result of Hendry's conduct, she testified she was "afraid of him" and felt "threatened" by him "to this day." Tr. Vol. IV, pp. 39, 43. She explained that because of his harassment, she no longer walks to work by herself, was scared to take her grandchildren in public, and began taking medication for anxiety and depression. The record also reveals that P.K. began routinely locking her door, requested a police escort to her car, and was too afraid to drive straight home after her confrontation with Hendry in the parking lot. Despite this, Hendry argues that P.K. was merely "an uneasy person," as she remarked once in an early police interview; however, this ignores P.K.'s other testimony explaining her fear. *Id.* at 89. Essentially, Hendry asks us to reweigh the evidence, which we will not do. *See Drane*, 867 N.E.2d at 146.

[41] A reasonable jury could determine that P.K.'s fear was reasonable. During her first interaction with Hendry, P.K. witnessed him shout threats to fight a police officer, showing Hendry's willingness to engage in violence. Hendry then

continued to defy boundaries, filming P.K. through her closed blinds, opening a door marked for employees only, and arguing with officers. This supports the conclusion that Hendry's harassment could cause a reasonable person to feel terrorized, intimidated, or threatened, as required by the stalking statute.

[42] Based on the foregoing, and viewing the evidence in the light most favorable to the verdict, Hendry's conviction for stalking P.K. is supported by sufficient evidence.[5]

## II.    Aiding, Inducing, or Causing Harassment

[43] Hendry was also convicted of aiding, inducing, or causing harassment of Clinton city employees. The charging information specified the conduct underlying this charge: "Hendry posted YouTube videos portraying his negative and abusive interactions with City employees and then provided his YouTube followers with contact information for said employees resulting in

---

[5] To the extent that Hendry argues his contacts with P.K. were protected speech, he has waived this claim. Though his brief's initial Statement of Issues characterizes his contacts with P.K. as "constitutionally protected newsgathering efforts," Hendry does not elaborate on this assertion in his argument section. Appellant's Br., p. 4. As discussed above, Hendry's appellate argument never addresses the specific contacts underlying his stalking conviction, and he thus provides no analysis as to how these contacts—including banging on P.K.'s door, filming her through blinds, following her in the parking lot, and following her to a nearby business—are constitutionally protected activities. Neither the First Amendment nor the Indiana Constitution provide limitless protection for speech, and a detailed analysis is required to determine whether conduct is protected. *See, e.g.*, *Stone v. State*, 128 N.E.3d 475, 482 (Ind. Ct. App. 2019).

Our appellate rules require claims to be supported by cogent argument and citation to relevant authority. Ind. Appellate Rule 46(A)(8)(a). "We will not review undeveloped arguments, for a court which must search the record and make up its own arguments because a party has presented them in a perfunctory form runs the risk of becoming an advocate rather than an adjudicator." *Burnell v. State*, 110 N.E.3d 1167, 1171 (Ind. Ct. App. 2018) (internal quotation omitted). Hendry has failed to provide cogent argument on this issue, resulting in waiver of his claim. *See id.* at 1172.

several hundred calls communicating derogatory comments and threatening acts of personal harm to said employees." App. Vol. II, p. 103.

[44] Hendry acknowledges that the phone calls and voicemails constituted harassment. The harassment statute at issue here criminalizes the placement of phone calls with the intent to "harass, annoy, or alarm" and without the intent of legitimate communication. Ind. Code § 35-45-2-2(a)(1). After Hendry posted his video in April 2022, the city received over 350 threatening voicemails, and only a few conveyed actual matters of city business. Hendry acknowledged at trial that many of the messages were "disgusting and threatening," and on appeal concedes that those threatening messages "constitute an 'abuse' of the right to free speech." Tr. Vol. IV, p. 189-90; Appellant's Br., p. 16. Hendry also does not refute the connection between his videos and the messages. Threatening calls spiked just after the videos were posted and continued in significant numbers in the weeks that followed. Most of the messages referred to the people and events depicted in Hendry's videos.

[45] Hendry instead focuses his challenge on the purported lack of evidence connecting him to this harassment, or, in other words, his liability as a knowing accomplice to it. Indiana's accomplice liability statute provides that a person who "knowingly or intentionally aids, induces, or causes another person to commit an offense commits that offense." Ind. Code § 35-41-2-4. This statute establishes accomplice liability "not as a separate crime, but as a separate basis of liability for the crime charged." *Norvell v. State*, 960 N.E.2d 165, 168 (Ind. Ct. App. 2011).

[46] Hendry insists the evidence does not sufficiently show that he knowingly aided his viewers in harassing the city employees, and alternatively, he claims that his conduct was constitutionally protected. "[W]hile we approach a typical sufficiency challenge with great deference to the factfinder, to the extent that [it] implicates principles of freedom of speech, our supreme court has held that such '[d]eferential review . . . creates an unacceptable risk of under-protecting speech.'" *Haberkorn v. State*, 205 N.E.3d 253, 257 (Ind. Ct. App. 2023) (quoting *Brewington v. State*, 7 N.E.3d 946, 955 (Ind. 2014)). Therefore, when presented with such situations, we "independently examine the record 'to assure ourselves that the [conviction] does not constitute a forbidden intrusion on the field of free expression.'" *Id.* (same). After such examination, we are unpersuaded by Hendry's sufficiency and constitutional arguments.

## A. Sufficient Evidence Supports Hendry's Conviction for Aiding, Inducing, or Causing Harassment

[47] A conviction as an accomplice requires evidence of "affirmative conduct, either in the form of acts or words, from which an inference of a common design or purpose to effect the commission of a crime may be reasonably drawn." *Griffin v. State*, 16 N.E.3d 997, 1003 (Ind. Ct. App. 2014). A defendant need not have "personally participated in the commission of each element of the offense." *Madden v. State*, 162 N.E.3d 549, 557 (Ind. Ct. App. 2021). In determining whether a person is liable as an accomplice, a factfinder considers: "(1) presence at the crime scene; (2) companionship with another engaged in a crime; (3)

failure to oppose the commission of the crime; and (4) the course of conduct before, during, and after the occurrence of the crime." *Id*.

[48] Hendry claims that he did not participate in any "concerted action" with those who made the harassing phone calls to Clinton city employees and that he did not know about the phone calls until pre-trial discovery. Appellant's Br., p. 18. But the record contains multiple pieces of evidence showing that Hendry: (1) knew that including the city's phone number in his YouTube video posts would lead his viewers to call; and (2) actively facilitated that harassment campaign.

[49] When Hendry posted his first video from April 2022—which featured Hendry threatening to fight Chief MacLaren and explaining that he continuously called the mayor's office for 15 minutes—he included in the caption the phone number for the mayor's office and police department. Then, when Hendry posted his video from September 2023—in which he repeatedly visited P.K.'s door, called her the mayor's "little play toy," and argued with Officer Finley— his caption again included the mayor's phone number. State's Exh. 2 at 12:09. This time, the phone number was accompanied by an explicit call to action: "To complain, and To ask why [P.K.] isnt (sic) working in the water office." State's Exh. 19.

[50] Though Hendry claims he "never knows how viewers react to any of his postings," this is directly contradicted by his testimony at trial. Appellant's Br., p. 18. Hendry stated that many of his viewers were "First Amendment enthusiasts" who "like to express their grievances via telephone, some via

email, and some other ways." Tr. Vol. IV, pp. 127-28. Hendry then explained why he included the phone numbers in the caption: "people actually asked me for the information *so that they could call*." *Id.* at 166 (emphasis added). He also said it was "easier" to put that information in the caption rather than respond to each individual person who asked. *Id.* at 127. Hendry's own testimony shows both a level of companionship with his viewers and an awareness that they often respond to his videos by calling the people featured. In fact, enabling viewers to call was the very reason Hendry put the numbers in the caption.

[51] Hendry's other conduct during and after the harassment shows that he recognized, and even celebrated, that his videos caused the onslaught of threatening voicemails. After posting the September 2023 video, Hendry called P.K. to ask her if the office had received a lot of calls. Then, when Hendry posted that same video to another one of his YouTube channels, he bragged in his caption: "My questions had enough power to shut the City Hall Down." Exh. 22. These statements could reasonably be interpreted to show that Hendry had expected the calls to follow his video and that he even took credit for the barrage of calls he saw himself as causing. This conduct supports Hendry's liability as an accomplice.

[52] Finally, the content of his videos provides important context. Hendry portrayed Clinton city hall employees in a negative light, to put it mildly. His videos included inflammatory language and baseless accusations of extreme employee misconduct—a conspiracy to kidnap Hendry, an employee being under the influence of drugs at work, and sexual relationships between co-workers. In his

videos, Hendry goads employees to engage in confrontation, threatening to fight Chief MacLaren and asking Officer Finley to threaten him. Hendry filmed himself swearing at and threatening city employees, and the resulting voicemails matched that antagonistic tone. Hendry also explained in his April 2022 video that he "continuously call[ed]" the mayor's office for "15 minutes," modeling the tactic of repeated phone calls. State's Exh. 1 at 17:14-17.

[53] From this record, the jury could reasonably infer that Hendry knew his inflammatory videos would anger and incite an audience who had a practice of calling with grievances. The jury also could reasonably infer from this evidence that Hendry knew his videos, when accompanied by the city's phone numbers and the invitation to "complain" and "ask" questions, would induce a wave of threatening calls and voicemails to Clinton's city hall. State's Exh. 19. A reasonable factfinder could conclude that Hendry knowingly and intentionally aided, induced, or caused his viewers to place threatening phone calls to the city, which constituted harassment under Indiana Code § 35-45-2-2(a)(1).

## B. Hendry Fails to Demonstrate That His Conduct Was Constitutionally Protected

[54] Hendry also claims that his conduct was constitutionally protected activity, arguing that his postings and his "[p]ublication of the Mayor's telephone number where viewers might register complaints is a clear exercise of [his] right to free speech." Appellant's Br., p. 15. He then cites both the First Amendment to the United States Constitution and Article 1, § 9 of the Indiana Constitution.

## 1. Federal Constitution Claim

The First Amendment prohibits laws "abridging the freedom of speech." U.S. Const. amend. I. Though the First Amendment protects a broad range of expression, its protections are not absolute. *State v. Katz*, 179 N.E.3d 431, 452 (Ind. 2022). "The Supreme Court has 'long recognized that the government may regulate certain categories of expression consistent with the Constitution.'" *Id.* (quoting *Virginia v. Black*, 538 U.S. 343, 358 (2003)). "These unprotected categories have 'such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.'" *Id.* at 453 (quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382-83 (1992)).

One such category of unprotected speech is "speech integral to criminal conduct." *Id.* (citing *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949)). "[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language." *United States v. Hansen*, 599 U.S. 762, 783 (2023) (quoting *Giboney*, 336 U.S. at 502). "Speech intended to bring about a particular unlawful act has no social value; therefore, it is unprotected." *Id.*

Thus, the First Amendment does not shield speech that aids or solicits criminal conduct merely because the speech, viewed in isolation, might otherwise be protected. *See Giboney*, 336 U.S. at 498 (finding speech was integral to criminal

conduct and thus unprotected by the First Amendment where appellants picketed to induce company to engage in unlawful practices, though defendants characterized picketing as aiming to improve working conditions). Speech is not protected if it is "an essential and inseparable part" of the unlawful conduct. *Id.* at 502.

[58] Hendry's conduct here falls squarely within this category of unprotected speech. He was convicted of aiding, inducing, or causing harassment because his inflammatory videos, with captions including the city's phone number and an invitation to call and complain, induced his viewers to flood the phone lines with harassing phone calls. The conduct which he claims was protected speech was the very mechanism by which he knowingly induced the harassment.

[59] Hendry never addresses this exception and thus provides no argument that his speech does not fall in this category. Instead, he argues his postings were not "true threats"—defending against a different category of unprotected speech. However, this "true threat" analysis is not relevant, as Hendry was not convicted of directly making threats but of causing harassment. And even the underlying harassment here does not require the transmission of any threats but merely placing calls with the intent to "harass, annoy, or alarm." Ind. Code § 35-45-2-2(a)(1). As a result, the "true threat" doctrine does not apply to the

conduct at issue here: uploading inflammatory videos that included the city's phone number and inducing his viewers to make the harassing calls.[6]

[60] Because Hendry's speech was an essential part of his inducing and aiding the criminal harassment, it falls outside First Amendment protection, and his claim under the First Amendment fails.

## 2.   Indiana Constitution Claim

[61] Article 1, § 9 of the Indiana Constitution provides that "[n]o law shall be passed, restraining the free interchange of thought and opinion, or restricting the right to speak, write, or print, freely, on any subject whatever." But as with the First Amendment, these protections are not unlimited. Article 1, § 9 also states: "but for the abuse of that right, every person shall be responsible." This "responsibility clause expressly recognizes the state's prerogative to punish expressive activity that constitutes an 'abuse' of the right to speak." *Whittington v. State*, 669 N.E.2d 1363, 1368 (Ind. 1996).

[62] "Courts employ a two-step inquiry for challenges under Article 1, Section 9." *McGuire v. State*, 132 N.E.3d 438, 444 (Ind. Ct. App. 2019). "First, a reviewing court must determine whether state action has restricted a claimant's expressive

---

[6] The State responds to Hendry's First Amendment claim by relying on *Stone v. State*, 128 N.E.3d 475 (Ind. Ct. App. 2019), for the proposition that the telephone harassment statute at issue here is content-neutral, and therefore Hendry's claim fails. *See id.* at 481-82. But here, Hendry's liability as an accomplice was based on his posting of videos with the city's phone numbers, and not placing the calls himself. Although he may be held equally responsible for those calls, *see Madden*, 162 N.E.3d at 557, Hendry's conduct serving as the basis for his accomplice liability (posting the videos with the city's phone numbers) is analytically distinct from the calls themselves. Therefore, *Stone* does not resolve whether Hendry's conduct is constitutionally protected.

activity." *Whittington*, 669 N.E.2d. at 1367. "Second, if it has, the court must decide whether the restricted activity constituted an 'abuse' of the right to speak." *Id.* "One way a claimant can try to meet this burden is to show that his or her expressive activity was political." *Id.* at 1369.

[63] Hendry makes the conclusory assertion that his conduct was protected political speech without further analysis. In fact, he does not cite or engage in this broader two-step framework at all. Hendry merely cites *Whittington* for the proposition that "[e]xpressive activity is political, for the purposes of the responsibility clause, if its point is to comment on government action, whether applauding an old policy or proposing a new one, or opposing a candidate for officer or criticizing the conduct of an official acting under color of law." Appellant's Br., p. 16 (quoting *Whittington*, 669 N.E.2d. at 1370). Hendry, however, does not include the other part of that proposition: "where an individual's expression focuses on the conduct of a private party—*including the speaker himself or herself*—it is not political." *Whittington*, 669 N.E.2d. at 1370 (emphasis added). And even when non-political expressions are "coupled with political statements, speech is not necessarily unambiguously political." *McGuire*, 132 N.E.3d at 445.

[64] Hendry therefore does not analyze how his conduct does or does not fall within the definition of political speech. "[T]he burden of proof is on the claimant to demonstrate that his or her expression would have been understood as political." *Whittington*, 669 N.E.2d. at 1370. Given Hendry's lack of analysis— and considering that much of his speech concerned his own treatment by

Clinton officials, which suggests it was not unambiguously political—Hendry has failed to prove that his conduct was protected political speech. *See id.* at 1371 (finding conduct not unambiguously political where defendant's speech defended her own conduct).

[65] Where "speech was not unambiguously political, we apply rationality review" to the State's restriction. *McGuire*, 132 N.E.3d at 445. A restriction on speech is upheld under rationality review if the State could reasonably conclude the speech posed a threat to peace, safety, and well-being. *Id.*; *Ellis v. State*, 194 N.E.3d 1205, 1218 (Ind. Ct. App. 2022). Based on Hendry's conduct—posting inflammatory videos in which he threatened to fight a police officer and disobeyed the rules of city hall, and then inciting his viewers to place calls to the city in response—the State "could have reasonably concluded the speech posed a threat to peace, safety, and well-being." *McGuire*, 132 N.E.3d at 445. Hendry's claim under the Indiana Constitution fails.

## Conclusion

[66] The evidence of Hendry's impermissible contacts with P.K.—including banging on her door, filming her through her closed blinds, and following her to her car—support his conviction for stalking. Similarly, the record supports the conclusion that Hendry's posting of inflammatory videos on YouTube and his provision of the city's contact information therewith "so that [his viewers] could call" constituted aiding, inducing, or causing the harassment of city workers.

Tr. Vol. IV, p. 166. Hendry fails to demonstrate that his actions were constitutionally protected. We affirm his convictions.

Bailey, J., and Brown, J., concur.

ATTORNEY FOR APPELLANT

Kay A. Beehler
Terre Haute, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Jennifer Anwarzai
Deputy Attorney General
Indianapolis, Indiana